CHURCH OF SCIENTOLOGY OF CALI-
FORNIA, A non-profit corporation,
Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF
JUSTICE, William B. Saxbe, Attorney
General of the United States; Drug En-
forcement Administration, Defendants-
Appellees.

No. 76–2506.

United States Court of Appeals,
Ninth Circuit.

Nov. 8, 1979.

Rehearing Denied Jan. 30, 1980.

418

Joe Thrasher, Cameron, Shervey & Thrasher, Rice Lake, Wis., for plaintiff-appellant.

Leonard Schaitman, Washington, D. C., on brief; Paul Blankenstein, Washington, D. C., for defendants-appellees.

Before BARNES, WALLACE and TANG, Circuit Judges.

BARNES, Senior Circuit Judge.

Church of Scientology of California ("CSC") appeals the district court's upholding of the Drug Enforcement Administration's ("DEA")[1] decision not to disclose cer-

1. The DEA was created pursuant to the Reorganization Plan No. 2 of 1973 (eff. July 1, 1973, 38 FR 15932, 87 Stat. 1091, as amended Mar. 16, 1974, Pub.L. 93–253, § 1, 88 Stat. 50) to consolidate the antidrug enforcement activities of the federal government into one agency in the Department of Justice. *See* President's Message submitted together with the Reorganization Plan cited in [1973] U.S.Code Cong. & Admin.News, pp. 3554, 3555. The DEA's responsibilities include conducting relations with drug law enforcement officials of foreign governments and coordinating joint efforts with state and local law enforcement agencies. *Id.*

tain documents sought by CSC under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The main issue on appeal is the scope of the term "confidential source" as used in the 7(D) exemption of the FOIA, 5 U.S.C. § 552(b)(7)(D).[2]

## I. FACTS

On May 2, 1974, CSC requested that the DEA make available for copying and inspection all records and information in its possession regarding the activities of "The Church of Scientology of California, Church of Scientology, or Scientology". Initially, the DEA admitted the possession of only four documents relating to the "Church of Scientology". It stated that the information was contained in investigative files compiled for law enforcement purposes and therefore exempt from disclosure under the 7th exemption.[3] Subsequently, the DEA received 14 further requests for information as to CSC, its related entities and its founder L. Ron Hubbard.

After exhausting its administrative remedies, CSC brought this FOIA suit in the federal district court on December 4, 1974. In the meantime, the DEA had canvassed all of its 161 field offices, both foreign and domestic, and had located 126 other documents which were subject to CSC's requests. The majority of those materials were released to CSC. However, the DEA refused to produce fifteen documents in their entirety invoking the 7(C)[4] and 7(D) exemptions as to each of the documents plus other FOIA exemptions with respect to particular items.[5] In addition, portions of nine other documents were not released on the grounds of the 7(C) and 7(D) exemptions.[6] Of these twenty-four documents, eleven contained information from non-federal domestic law enforcement authorities, seven had data from foreign law enforcement sources, and the other six contained information supplied by individuals cooperating with the DEA.

At the hearing, the government presented witnesses who testified that information provided by one law enforcement agency to another is customarily given with the understanding that it will not be revealed to members of the general public without the prior approval of the providing source.[7] Further, it was established that foreign, state and local law enforcement entities would at least be very reluctant, if not prohibited by their own laws, from disclosing confidential information to a federal agency which could not guarantee the continued confidentiality of that information.

After hearing oral arguments from the parties, the district court judge examined the twenty-four contested documents *in*

---

2. The 7(D) exemption of the FOIA, 5 U.S.C. § 552(b)(7)(D), exempts from disclosure:

 (7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would
 . . .
 (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source . . . . .

3. Prior to the 1974 amendments, the 7th exemption of the FOIA covered: "investigatory files compiled for law enforcement purposes *except to the extent available by law to a party* other than an agency . . . . ."

4. 5 U.S.C. § 552(b)(7)(C) exempts matters that "constitute an unwarranted invasion of personal privacy."

5. *See Church of Scientology v. U. S. Dept. of Justice,* 410 F.Supp. 1297, 1299–1300 ns. 3–13 and accompanying text (C.D.Cal.1976).

6. *Id.*

7. Among the government's witnesses were Rocky Pomerance, Chief of Police, Miami Beach, Florida, and immediate past president of the International Association of Chiefs of Police; Vernon J. Calhoun, Chief of the Division of Investigation and Narcotics, Nevada State Police, James Taylor, First Deputy Police Commissioner, New York City Police Department; David C. Dilley, Commander, Metropolitan Police and Intelligence Branch, Scotland Yard, London, England; and Francis Le Moeul, Controller General, French National Police, and Chief, French Bureau of Narcotics.

*camera.* Thereafter, he ordered a minor portion of that material to be released as he found it to have been improperly withheld. As to the bulk of the 24 documents, the court found that the government was justified in withholding the remaining documents pursuant to the 7(D) exemption.[8] In reaching his decision, the judge concluded that the term "confidential source" in the 7(D) exemption included foreign, state and local law enforcement agencies. Because the 7(D) exemption was found to be applicable to all of the documents still at issue, the judge did not rule on the other FOIA exemptions which the government had proffered to justify its refusal to release the materials.

CSC now appeals to this court, attacking both the district court's conclusion as to the scope of the 7(D) exemption and the sufficiency of its findings of fact. We are in substantial agreement with the district court's decision below for the reasons stated in its opinion, and we herein affirm.[9]

## II. DISCUSSION

### A. Interpreting the 7(D) Exemption

From the language of the statute on its face, the 7(D) exemption excludes from mandatory disclosure investigatory records compiled for law enforcement purposes in two different situations: first, where the production would "disclose the identity of a confidential source" and, second, "in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation", if the production would disclose "confidential information furnished only by the confidential source." 5 U.S.C. § 552(b)(7)(D). If we were only to look at the language of the 7(D) exemption and give the words utilized therein their plain and ordinary meaning,[10] we would be forced to conclude that the term "confiden-

tial source" refers simply to the origin of information, without distinction among the types of originators. Following that reading of the exemption, we would hold that "confidential source" includes foreign, state and local law enforcement agencies in its scope.

All of the cases that we have found which have considered the question, with one exception, have agreed with the above interpretation of the language of the 7(D) exemption. *See Nix v. United States*, 572 F.2d 998, 1005 (4th Cir. 1978); *Lopez Pacheco v. FBI*, 470 F.Supp. 1091, 1103 (D.P.R. 1979); *Varona Pacheco v. FBI*, 456 F.Supp. 1024, 1032 (D.P.R.1978); *Lesar v. United States*, 455 F.Supp. 921, 924 (D.D.C.1978); *cf., Mitsubishu Elec. Corp. v. United States Dep't of Justice*, 1977–1 Trade Cases ¶ 61,-356 at p. 71,263 (D.D.C.1977) (held that the 7(D) exemption would cover multi-national companies as "confidential sources"); *see also Terkel v. Kelly*, 599 F.2d 214, 217 (7th Cir. 1979) (*dicta*); *contra Ferguson v. Kelley*, 448 F.Supp. 919, 922 (N.D.Ill.1978), *supplemental opinion* 448 F.Supp. at 925, *on motion for reconsideration* 455 F.Supp. 324, 326–27 (N.D.Ill.1978).

However, the sufficiency of a court's reliance solely upon the "plain meaning" of the language of a statute in interpreting its terms has come into question. *See generally* Murphy, Old Maxims Never Die: The "Plain Meaning Rule" and Statutory Interpretation in the "Modern" Federal Courts, 75 Col.L.Rev. 1299 (1975) ("Muprhy"). Recent pronouncements by the Supreme Court and this court have been somewhat inconsistent on this point. On the one hand, the Court in *Train v. Colorado Pub. Interest Research Group*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), held that it was error for the court of appeals to exclude reference to the legislative history of the statute in question when the appel-

---

**8.** 410 F.Supp. at 1300.

**9.** *Id.*

**10.** Words used in a statute are to be given their ordinary meaning in the absence of persuasive

reasons to the contrary. *Banks v. Chicago Grain Trimmers*, 390 U.S. 459, 465, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968); *accord Trans Alaska Pipeline Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978).

late court's reliance on the plain meaning of the words in the statute produced a result which "would have marked a significant alteration of the pervasive regulatory scheme embodied in . . . [another statute]" and when that reliance contributed little to resolving the issue before the court of appeals. *Train, supra,* 426 U.S. at 23–24, 96 S.Ct. at 1948. In so deciding the Court held that there was no "rule of law" which forbids the use of extrinsic aids in construing the meaning of statutory language however clear the words may appear on "superficial examination". (Quoting from *United States v. American Trucking Assns.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).) Following the holding of the *Train* case, this circuit has permitted, on occasion, an expansive approach to the utilization of extrinsic aids such as legislative history in statutory interpretation. As stated in *Pettis ex rel. United States v. Morrison-Knudsen Co.,* 577 F.2d 668, 671 (9th Cir. 1978):

> We begin by noting that the language of 31 U.S.C. § 232(C) affords no crevice of ambiguity within which to nestle the exception Pettis seeks. It presents a face, smooth, sharp, and unyielding. Nonetheless, we must heed the Supreme Court's recent admonition in *Train v. Colorado Public Interest Research Group,* 426 U.S. 1, 9–10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), to examine relevant legislative history in the search for the intent of Congress even when the statute is clear and unambiguous on its face. It is always possible that Congress did not quite mean what it said and did not quite say what it meant.

On the other hand, the Supreme Court recently articulated the opposite position and seemingly reaffirmed the former "plain meaning rule". In *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296 n. 29, 57 L.Ed.2d 117 (1978), it was stated that: "When confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning." Likewise, this circuit has also recently breathed new life into the rule. *See*

*United States v. Rone,* 598 F.2d 564, 569 (1979) ("When no ambiguity is apparent on the face of a statute, an examination of legislative history is inappropriate."); *cf., Adams v. Morton,* 581 F.2d 1314, 1320 (9th Cir. 1978), *cert. denied, Gros Ventre Tribes of Fort Belknap Indian Reservation, Montana v. United States,* 440 U.S. 958, 99 S.Ct. 1498, 59 L.Ed.2d 771 (1979).

The plain meaning rule can be viewed as consisting of two propositions. Initially, the rule stands for the notion that if the language of a statute is clear and there is no ambiguity, then there is no need to "interpret" the language by resorting to the legislative history or other extrinsic aids. *See e. g. Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 492, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); *Caminetti v. United States,* 242 U.S. 470, 490, 37 S.Ct. 192, 61 L.Ed. 442 (1917). Secondly, and more importantly, the rule stands for the proposition that in the vast majority of its legislation Congress does mean what it says and thus the statutory language is normally the best evidence of congressional intent. As observed by the Court in *United States v. Missouri Pac. R.R.,* 278 U.S. 269, 278, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929): ". . . where the language of an enactment is clear and construction according to its terms does not lead to absurd or impracticable consequences, the words employed are to be taken as the final expression of the meaning intended." It is the former component of the plain meaning rule which has been called into question by cases such as *Train* and *Pettis,* not the latter proposition.

While there may be instances where the language of a statute is so lucid on a particular issue that resorting to legislative history would be inappropriate (the first component of the plain meaning rule), such a rule is normally not applicable where, as here, the court must construe the meaning of an undefined term in a statute when the term used does not consist of words of art. However, even in the latter situation, the second component of the plain meaning rule cannot

be ignored. We agree with the Court's language in *American Trucking Assns., supra,* 310 U.S. at 543–44, 60 S.Ct. at 1063–1064:

There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning. When that meaning has led to absurd or futile results, however, this Court has looked beyond the words to the purpose of the act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one "plainly at variance with the policy of the legislation as a whole" this Court has followed that purpose, rather than the literal words. When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." (Footnotes omitted.)

█ In the present case, we have concluded that the statutory language is clear and unambiguous if we give the words of the 7(D) exemption their ordinary meaning. However, we concede that the term "confidential source" is not a term of art. Moreover, the appellant herein has argued that our interpretation, which was also reached by the district court below, is contrary to the policy of the FOIA act as a whole and the intent of Congress in enacting the 7(D) exemption. For these reasons, we now turn to the legislative history of the 7(D) exemption and examine the congressional intent. Pursuant to our adherence to the applicable portion of the plain meaning rule, we believe that "the plainer the language, the more convincing contrary legislative history must be." *United States v. United States Steel Corp.,* 482 F.2d 439, 444 (7th Cir.), *cert. denied,* 414 U.S. 909, 94 S.Ct. 229, 38 L.Ed.2d 147 (1973). Also, we note that "The proper function of legislative history is to solve, not create, an ambiguity."

*Rone, supra,* 598 F.2d at 569. "In construing a statute, the Court has ruled that legislative materials, if 'without probative value, or contradictory, or ambiguous,' should not be permitted to control the customary meaning of words. *United States v. Dickerson,* 310 U.S. 554, 562, [60 S.Ct. 1034, 1038, 84 L.Ed. 1356] (1940)." *NLRB v. Plasterers' Union,* 404 U.S. 116, 129 n. 24, 92 S.Ct. 360, 368 n. 24, 30 L.Ed.2d 312 (1971).

Prior to the 1974 amendments to the FOIA, 5 U.S.C. § 552(b)(7) exempted from disclosure "investigatory files compiled for law enforcement purposes except to the extent available by law to a party other than an agency . . . ." The initial versions of the 1974 House of Representatives and Senate bills to amend the FOIA did not contain any language altering the 7th exemption. *Freedom of Information Act and Amendments of 1974 (P.L. 93–502), Source Book: Legislative History, Texts and Other Documents* at 133–34 and 192 (Joint Comm. Print 1975) (hereinafter referred to as "Source Book"). On May 30, 1974, Senator Phillip Hart offered Amendment No. 1361 which proposed to change the 7th exemption to read as follows:

Investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication or constitute a clearly unwarranted invasion of personal privacy, (C) disclose the identity of an informer, or (D) disclose investigative techniques and procedures.

*Source Book* at 112 and 332.

After amending the House measure with its own language, the Senate adopted the amended House bill. On June 6, 1974, the legislation was sent to a joint House and Senate conference committee which made substantial changes in the proposed amended 7th exemption. In particular, the term "confidential source" was substituted for the word "informer" in the exemption. The conference later added language also

protecting confidential information compiled from a confidential source by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation. *Source Book* at 115.

In the midst of the conference deliberations, President Ford wrote to Congressman William S. Moorhead, one of the co-sponsors of the legislation, expressing his concern as to various aspects of the proposed amendments, including those pertaining to the 7th exemption. On October 17, 1974, President Ford returned the bill (H.R. 12471) to the House without his approval noting, *inter alia,* the problem of the abridgement of confidentiality as to law enforcement records. *Source Book* at 398. In November 1974, after debate in both the House and the Senate, the veto was overridden and the amendments became effective on February 19, 1975.

■ After a careful reading of the legislative materials, we are in agreement with the district court's conclusion below that the issue of the scope of the term "confidential source" is not "precisely addressed in the legislative history".[11] Admittedly, when Senator Hart initially proposed his amendment to the 7th exemption, he spoke only in terms of "informers" and "concerned citizens".[12] However, even at that time, Senator Hart did not consider his amendment to be a "radical departure" from existing case law under the preamendment FOIA, where "the courts looked to the reasons for the exemption" in making their decisions as to disclosure. *Source Book* at 334. Indeed, in response to a question as to the FBI's ability to perform its investigatory duties under his proposed amendment, Senator Hart stated that:

"However, my amendment would not hinder the Bureau's performance in any way. The Administrative Law Section of the American Bar Association language,

which my amendment adopts verbatim, was carefully drawn to preserve every conceivable reason the Bureau might have for resisting disclosure of material in an investigative file:

If informants' anonymity—whether paid informers or citizens volunteers—would be threatened, there would be no disclosures;

\* \* \* \* \* \*

If in any other way the Bureau's ability to conduct such investigations was threatened, there would be no disclosure.

Thus, my amendment more than adequately safeguards against any problem which might be raised for the Bureau. *Source Book* at 351.

Thus, despite the limited nature of his initial comments, it is clear that Senator Hart did not intend his amendment to inhibit in any way a federal law enforcement agency's ability to conduct its lawful investigation. Indeed, in his only comments on the exemption after the changes made by the conference committee, Senator Hart uses the word "source" in its literal sense without any special qualification on the term. As he stated on November 21, 1974, in the debate arising from the Senate action and vote on the presidential veto:

The major change in conference was the provision which permits law enforcement agencies to withhold "confidential information furnished only by a confidential source". In other words, the agency not only can withhold information which would disclose the identity of a confidential source but also can provide blanket protection for any information supplied by a confidential source. The President is therefore mistaken in his statement that the FBI must prove that disclosure would reveal an informer's identity; all the FBI has to do is to state that the information was furnished by a confiden-

---

11. 410 F.Supp. at 1302.

12. Fourth, the amendment protects without exception and without limitation the identity of informers. It protects both the identity of informers and information which might reason-

ably be found to lead to such disclosure. These may be paid informers or simply concerned citizens who give information to enforcement agencies and desire their identity to be kept confidential. *Source Book* at 333–34.

tial source and it is exempt. In fact, this protection was introduced by the conferees in response to the specific request of the President in a letter to Senator Kennedy during the conference.

\* \* \* \* \* \*

The fact that the agencies can withhold information furnished by a confidential source relieves it of the burden of showing that disclosure would actually reveal the identity of a confidential source. . . .

*Source Book* at 451–52

From those statements, Senator Hart does not appear to limit the word "source" to only human sources but rather gives an expansive reading of the 7(D) exemption.[13]

In the Joint Explanatory Statement of the Committee of Conference ("Conference Report"), the following reason for the substitution of the term "confidential source" for the word "informer" is given:

The substitution of the term "confidential source" in section 552(b)(7)(D) is to make clear that the identity of a person other than a paid informer may be protected if the person provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred. Under this category, in every case when the investigatory records sought were compiled for law enforcement purposes—either civil or criminal in nature—the agency can withhold the names, addresses, and other information that would reveal the identity of a confidential source who furnished the information. However, where the records are compiled by a criminal law enforcement authority, *all* of the information furnished only by a confidential source may be withheld if the information was compiled in the course of a criminal investigation. In addition, where the records are compiled by an agency conducting a lawful national security intelligence investigation, all of the information fur-

nished only by a confidential source may also be withheld.
*Source Book* at 230.

■ Likewise, Senator Byrd in his arguments in favor of overriding the presidential veto makes similar remarks:

The Senate-passed version of the bill contained an amendment which would have required disclosure of information from a law enforcement agency unless certain information was specifically exempted by the act. What particularly disturbed me was that while the identity of an informer would be protected, the confidential information which he had given the agency would not have been protected from disclosure. Another matter that disturbed me was the use of the word "informer", since that could be construed to mean that only the identity of a paid "informer" was to be protected and not the identity of an unpaid confidential source. I was deeply concerned that without such protection, law enforcement agencies would be faced with a "drying-up" of their sources of information and their criminal investigative work would be seriously impaired.

The bill in the form now presented to the Senate has been significantly changed by the conference on these critical issues. The language of section 552(b)(7) has been changed from protecting from disclosure the identity of an "informer" to protecting the identity of a "confidential source" to assure that the identity of a person other than a paid informer may be protected. The language has also been broadened substantially to protect from disclosure all of the information furnished by a confidential source to a criminal law enforcement agency if the information was compiled in the course of a criminal investigation. Thus, not only is the identity of a confidential source protected but also protected from disclosure is all the information furnished by that source to a law enforcement agency in the course of a criminal investigation.

---

**13.** Courts look to the statements by the initiators or sponsors of proposed legislation when the meaning of words used in a statute is in

doubt. *National Woodwork Mfrs. Assn. v. NLRB,* 386 U.S. 612, 640, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967).

*Source Book* at 468.

In both statements, it is clear that the congressional intent was to broaden the scope of the proposed exemption to include sources of confidential information other than informers. The use of the word "person" in those contexts appears to be similar to the use of any collective noun. The word "person" in legal terminology is perceived as a general word which normally includes in its scope a variety of entities other than human beings. *See e. g.* 1 U.S.C. § 1. Had the Conference Report affirmatively stated that the term "confidential source" was limited to or applies only to persons, we would agree with appellant's position herein.

Likewise, a single comment was made by Senator Kennedy in the course of the debates that "we also provided that there be no requirement to reveal not only the identity of a confidential source, but also any information obtained from him in a criminal investigation." *Source Book* at 459. However, the use of a singular masculine pronoun is often made where the sex, if any, of its antecedent reference is unknown or where it refers to a collective noun which consists of entities of more than one sex. Given that the comment was made in the course of the debates on the Senate floor, where grammatical formalities are not always observed, we do not consider that one particular comment to be indicative. Senator Kennedy's other remarks on the 7(D) exemption do not demonstrate any intent to limit the scope of the term "confidential source". If we allowed this determination to be controlled by the mere use of a pronoun, we would be excluding non-human entities such as corporations and partnerships from the protection of the exemption. It is inconceivable that Senator Kennedy would not seek to assure the continued cooperation of non-human entities in law enforcement investigations by granting them confidentiality where necessary.

As with the district court below we are hesitant to rely solely upon "grammatical nuances" in the legislative materials to resolve the important issue involved herein.

Reliance instead should be made upon the congressional intent behind the 7(D) exemption which clearly manifests itself in the legislative history.

■ Congressman Moorhead (co-sponsor of the House Bill), Senator Kennedy (the Senate Conference Committee Chairman) and Senator Hart (the initiator of the amendment to the 7th exemption) have all stated that the conference committee "acted affirmatively to satisfy" President Ford's objections to the amended version of the (b)(7) exemptions. *Source Book* at 381 and 450. One of President Ford's objections had been the potential adverse effect of the 7th exemption, as initially proposed, upon law enforcement if "sources of information or the information itself are disclosed." *Source Book* at 380. As repeatedly expressed in the debates on the amended version of the 7th exemption by both proponents and opponents of the amendments, Congress was concerned that law enforcement agencies should not be faced with a "drying up" of their sources of information or have their criminal investigative work be seriously impaired. *Source Book* at 381, 391–92, 451, 468, 473, and 476. In response to that concern, it was continually stressed by members of the conference committee that:

> We have been careful to protect . . . law enforcement interests to the utmost in the bill we passed.
>
> \* \* \* \* \* \*
>
> We decided in conference, however, as a specific request from the President, to change that to protect confidential sources, which broadened it and provided a wider degree of protection.
>
> Then we also provided that there be no requirement to reveal not only the name of a confidential source, but also any information obtained from him in a criminal investigation. [Remarks of Senator Kennedy]
>
> *Source Book* at 440 and 459. *See* also remarks of Senator Hart, *Source Book* at 450–51.

It is obvious from the legislative history that Congress, while seeking to narrow the

7th exemption and thereby increase the disclosure of investigatory records when it would be reasonable to do so, intended to reaffirm its protection of confidential sources and confidential information so that law enforcement agencies would not be adversely affected in their lawful investigatory duties.

■ By giving the term "confidential source" its plain meaning, we will effectuate the stated congressional purpose behind the 7(D) exemption. Congress did not plan to prevent law enforcement agencies from gathering information from sources who would be reluctant to provide such information if their identities or their confidential information were made public. By refusing to accept the plain meaning of the word "source" and excluding foreign, state and local law enforcement agencies from the 7(D) exemption, an impairment to federal law enforcement groups will result which would be contrary to the congressional intent. Foreign, state and local law enforcement agencies are under no obligation to provide information to federal agencies in most instances.[14] There is substantial evidence in the record below that some of those groups would refuse to cooperate with federal agencies if they could not be assured of confidentiality in instances where they thought it was necessary.[15] While CSC argues that Congress intended to limit the scope of the 7(D) exemption to human sources, there is no evidence in the legisla-

tive history that the congressional concern was focused on the possibility of physical harm to individuals. Rather, the paramount concern was the loss of sources of confidential information.

A "plain meaning" interpretation of the 7(D) exemption would not be in conflict with the remainder of the FOIA. While the FOIA "is in favor of disclosure", *Department of Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976), it should be apparent that the subsection (b) exemptions are also a part of the FOIA and in their case Congress decided that there were "types of information that the Executive Branch must have the option to keep confidential." *Id.,* quoting *EPA v. Mink,* 410 U.S. 73, 79–80, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973); *see also FAA Administrator v. Robertson,* 422 U.S. 255, 261, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975). While one may employ the general purpose of the act as justification to narrowly construe the exemptions where there is an absence of congressional intent on a particular area covered by one of the exemptions, one must remember that the congressional intent in enacting the exemption was to preserve, not destroy, confidentiality in certain necessary situations. Consequently to say, as appellant does here, that one's interpretation of the exemption is consistent with the general purpose of the FOIA is to ignore the congressional intent which caused and required the enactment of the exemptions in the first place.

14. In *Ferguson v. Kelley, supra,* 448 F.Supp. at 922, the district court found that local law enforcement agencies were not within the 7(D) exemption because: "We are not certain that other law enforcement agencies can reasonably believe that all information which they may supply to a federal agency will be shielded from public disclosure. As public agencies subject to public scrutiny, other law enforcement agencies are in a very different position from that of a private citizen who has no legal duty to volunteer information to law enforcement agencies." As discussed *supra,* the district court is simply in error when it assumes that foreign, state and local law enforcement agencies have a duty to volunteer information to federal law enforcement agencies. Consequently, in this context, they are similar to private citizens, which the district court would place within the scope of the exemption.

15. *See Lopez Pacheco v. FBI, supra,* 470 F.Supp. at 1104 n. 16 and accompanying text (D.P.R.1979) where although the FBI was willing to release certain investigative documents obtained from state police officials in Washington, the state authorities refused to give the FBI permission to do so, stating in a letter that:

The matter to be determined is whether or not once local law enforcement agencies release information to the F.B.I., that information may be released by the federal agencies by virtue of the Freedom of Information Act. It is our position that if information given to the federal agencies is subject to such release without the statutory constraints of the State of Washington being followed, further information of such nature will not be available to Federal Agencies.

The purpose of the FOIA is to serve disclosure of federal agency activity, not as a means for private parties to find out what facts or opinions foreign, state or local law enforcement agencies have collected or made on them. *Cf.,* S.Rep.No.813, 89th Cong., 1st Sess., 3 (1965), quoted in *Department of Air Force, supra,* 425 U.S. at 361, 96 S.Ct. 1592; *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 143 n. 10, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). By including foreign, state and local law enforcement agencies in the 7(D) exemption, we would not be preventing any proper disclosure of federal agency action. If we adopt the approach suggested by appellant we would eliminate sources of information which the federal agencies may need without gaining any greater disclosure of the type of information which the FOIA seeks to reveal.

Finally, there is a rule of statutory interpretation that should be mentioned. A statute should not be interpreted so as to produce an absurd result. *Holy Trinity Church v. United States,* 143 U.S. 457, 461, 12 S.Ct. 511, 36 L.Ed. 226 (1892). Any inanimate entity, such as a corporation or a foreign law enforcement agency, must act through a human intermediary. If we now interpret "source" as limited only to human sources, there would be an absurd difference between saying that a federal agency received sought-after information from an agent, Mr. X, of a foreign law enforcement agency under an expressed or understood assurance of confidentiality and saying that the agency had received the information from the foreign law enforcement agency under the same assurance of confidentiality. *Cf., Victoria-Vogue, Inc. v. Valcourt, Inc.,* 148 F.Supp. 160, 172 (S.D.N.Y.1956). We do not think that Congress intended to impose such a form over substance rule for law enforcement agencies.

Even assuming that the legislative history shows that Congress had only "human" sources in mind when it drafted 7(D), we would reach the same result. There is no direct evidence in the legislative history that Congress specifically sought to exclude law enforcement agencies from the definition of confidential source. In circumstances such as these, where the legislative history is inconclusive, we should not impute to Congress an intent to exclude law enforcement agencies where they are within the plain meaning of the statute.

Although rising in a somewhat different context, the recent case of *United States v. Jones,* 607 F.2d 269 (9th Cir., 1979), is instructive. In *Jones,* the issue was whether allegations that the defendants had stolen and damaged Indian artifacts were covered by the general theft and malicious mischief statutes, 18 U.S.C. §§ 641 and 1361. Finding that the language of the statutes applied to the conduct in question and that there was no affirmative evidence that Congress intended to limit the application of the statutes, we held that the conduct came within the scope of the statutes. "Where the words and purpose of a statute plainly apply to a particular situation, however, the fact that the specific application of the stature never occurred to Congress does not bar us from holding that the situation falls within the statute's coverage." *Id.* at 273.

In this case, law enforcement agencies fall within the plain meaning of the statutes. Furthermore, their inclusion within 7(D) furthers the statutory purpose of preventing the "drying up" of sources of confidential information. The legislative history does not evidence an intent specifically to exclude law enforcement agencies. In these circumstances, we should give effect to the plain meaning of the statute even if Congress did not contemplate this particular application.

In conclusion, we find that the language of the 7(D) exemption on its face would clearly include foreign, state and local law enforcement agencies within its scope. The legislative materials are ambiguous as to an expressed limitation on the meaning of the term "confidential source" and hence do not control the customary meaning of the words. *Plasterers' Union, supra,* 404 U.S. at 129 n. 24, 92 S.Ct. at 368 n. 24. More importantly, the evidence of the congres-

sional intent as to the 7(D) exemption in the legislative history strongly supports our interpretation.

### B. *Sufficiency of the Findings Below*

 CSC makes two arguments as to the sufficiency of the district court's findings of fact. Both of its contentions stem from language in the reported opinion where the district court stated:

> The materials involved are criminal investigatory records compiled for law enforcement purposes given under conditions of confidentiality.

410 F.Supp. at 1300. First, it is argued that the district court did not find that the non-disclosed documents contained confidential information which had been furnished *only* by a confidential source as required by the 7(D) exemption. Second, it is argued that the district court failed to specifically find that the information had been compiled in the course of criminal investigations.

If the quoted passage was indeed the sole basis for the district court judge's conclusion that the contested documents were within the 7(D) exemption, we would readily agree with CSC that the judge was in error. However, the quoted passage is merely a part of the general background portion of the opinion. As to this issue, it is more important, not to examine what the judge said, but what he did.

From the record, we are convinced that the district court judge recognized the applicable requirements of the 7(D) exemption and adequately required the government to satisfy its burden of proof as to each document which it claimed was exempted. In particular, after reviewing the Reporter's Transcript of Proceedings *In Camera* which was submitted to this Court as a sealed exhibit, we note that the district court judge carefully went "through each document step by step" and had the government's attorneys explain the grounds urged in support of the exclusions. During that

process, the judge queried the attorneys as to the sources of the information,[16] and the circumstances by which the information was obtained. We are satisfied that the district court judge correctly applied the 7(D) exemption herein by requiring, where appropriate, the government to show that the confidential information was only furnished by a confidential source and during the course of a criminal investigation.

### III. *CONCLUSION*

The judgment of the district court is AFFIRMED.

WALLACE, Circuit Judge, dissenting:

I am in sympathy with the result reached by the majority. The statute is clear enough on its face. It makes eminent sense and I quite frankly wish that it were the law. Unfortunately, however, because the Supreme Court requires us to examine legislative history in construing the meaning of a statutory term such as the one before us, *Train v. Colorado Pub. Interest Research Group*, 426 U.S. 1, 9–10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), and because the legislative history of the amendment to 5 U.S.C. § 552(b)(7)(D), as I read it, clearly expresses a congressional intent that "confidential source" be limited to human sources, I must respectfully dissent. In concluding that the documents withheld by the DEA are not entitled to protection from disclosure under (b)(7)(D), I would not reach appellant's challenge to the sufficiency of the lower court's findings.

I

The question before us, whether "confidential source" as used in (b)(7)(D) includes foreign, state, and local law enforcement agencies, is a difficult one. If I were looking only to the plain language of the statute, I would agree with the conclusion of my brethren that "source" refers simply to the origin of information, without distinc-

---

**16.** During the questioning as to the first contested document, the government's attorney conceded that, in the case of a document which would not reveal the identity of a confidential source, the government would be obligated to show that the confidential information came *only* from a confidential source.

tion among types of originators. However, the Supreme Court directed that legislative history should not be ignored when it aids in the resolution of a question of statutory construction, *Train v. Colorado Pub. Interest Research Group, supra*, 426 U.S. at 9–10, 96 S.Ct. at 1942, 48 L.Ed.2d at 440–441, and this circuit has demonstrated its willingness to heed that admonition "to examine relevant legislative history in the search for the intent of Congress even when the statute is clear and unambiguous on its face." *Pettis ex rel. United States v. Morrison-Knudsen Co.*, 577 F.2d 668, 671 (9th Cir. 1978). *See also Hewlett-Packard Co. v. Barnes*, 571 F.2d 502, 504 n.4 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978).

To be sure, "reliance on legislative history in divining the intent of Congress is, as has often been observed, a step to be taken cautiously." *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977). Nonetheless, without additional guidance from the Supreme Court, I believe we are bound by the teaching of *Train*, and therefore we must take the more thorough approach and examine the legislative history for assistance in construction of the term "source." In doing so I, like my brethren, feel that we should heed the Court's instruction that "legislative materials, if 'without probative value, or contradictory, or ambiguous,' should not be permitted to control the customary meaning of words." *NLRB v. Plasterers' Local 79*, 404 U.S. 116, 129 n.24, 92 S.Ct. 360, 368 n.24, 30 L.Ed.2d 312 (1971) (quoting *United States v. Dickerson*, 310 U.S. 554, 562, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940)). *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 412 n.29, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Pettis ex rel. United States v. Morrison-Knudsen Co., supra*, 577 F.2d at 672.

## II

The district judge, although aware of passages "suggest[ing] that the legislator's focus was upon human sources," concluded that "[a]ssorted grammatical nuances . . . are no substitute for an assessment of what interpretation the legislature would have given the term source if the issue involved here had been presented at the time of passage." *Church of Scientology v. United States Dep't of Justice*, 410 F.Supp. 1297, 1302 (C.D.Cal.1976). Similarly, the majority relies on the fact that Congress did not "plan" to prevent law enforcement agencies from gathering information. Our determination, however, cannot be based upon subsequent happenings which may demonstrate the illogical position taken, nor upon what Congress would have done had it foreseen the facts of this case. I conclude that at the time of the passage of the statute, the legislative history shows that Congress intended the term "source" to mean "person."

As originally proposed by Senator Hart, subsection (b)(7)(D) exempted "[i]nvestigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would . . . disclose the identity of an informer . . .." *See* House Comm. on Government Operations & Senate Comm. on the Judiciary, 94th Cong., 1st Sess., Freedom of Information Act and Amendments of 1974 (P.L. 93–502) Source Book: Legislative History, Texts, and Other Documents 332 (Joint Comm. Print 1975) [hereinafter cited as Source Book]. At the time of his introduction of the amendment, Senator Hart stated:

> Fourth, the amendment protects without exception and without limitation the identity of informers. It protects both the identity of informers and information which might reasonably be found to lead to such disclosure. These may be paid informers or simply concerned citizens who give information to enforcement agencies and desire their identity to be kept confidential.

Source Book, *supra*, at 333–34. *See also id.* at 351 (memorandum letter from Senator Hart).

In response to President Ford's concerns, the Conference Committee substituted

"confidential source" for "informer."[1] *Id.* at 367, 378, 450–51, 459 (remarks of Senators Kennedy and Hart and Congressman Moorhead). Its joint explanatory report, which "represents the considered and collective understanding of those [legislators] involved in drafting and studying proposed legislation," *Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 325, 24 L.Ed.2d 345 (1969), said:

> The substitution of the term "confidential source" in section 552(b)(7)(D) is to make clear that the identity of a *person* other than a paid informer may be protected if the *person* provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred. Under this category, in every case where the investigatory records sought were compiled for law enforcement purposes—either civil or criminal in nature—the agency can withhold the names, addresses, and other information that would reveal the identity of a confidential source *who* furnished the information.

H.R.Rep.No.93–1380 & S.Rep.No.93–1200, 93d Cong., 2d Sess., *reprinted in* [1974] U.S. Code Cong. & Ad.News, pp. 6285, 6291, *and in* Source Book at 230 (emphasis added).

My brethren disregard the clear language of this explanatory report by contending that the Conference Committee used "person" as a collective noun and that the expansive nature of their message precludes any restrictive reading of "confidential source." Not only is it unlikely that the Committee was using the law dictionary definition of person, as my brethren contend, but even if they were, that definition of the term would not include foreign, state, and local law enforcement agencies. *See, e.g.*, 1 U.S.C. § 1. The Committee's use of "person" in explaining the change from "informer" plainly reveals that their intent to protect only human sources had not changed. Moreover, the majority's reliance on the expansive intent of the Committee report is misplaced. General intent should not be used to controvert specific language; indeed, the Committee itself chose to express its intent by the term "person."

While floor debates are accorded less weight than committee reports, *United States v. International Union UAW*, 352 U.S. 567, 585–86, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); *accord, International Tel. & Tel. Corp. v. General Tel. & Elec. Corp.*, 518 F.2d 913, 921 (9th Cir. 1975), the floor discussion in the Senate with respect to this passage supports this view of "source." Statements made both before passage of the amendment in the Senate and following the Conference Committee Report and Presidential veto indicate that Senators Hart and Kennedy, both members of the Conference Committee, and Senator Byrd assumed the exemption referred to persons or individuals.[2] The government argues and the ma-

1. The President wrote that he was:

 concerned with any provision which would reduce our ability to effectively deal with crime. This amendment could have that effect if the sources of information or the information itself are disclosed. These sources and the information by which they may be identified must be protected in order not to severely hamper our efforts to combat crime.

 Source Book, *supra*, at 369–70 (letter from President Ford to Senator Kennedy, Aug. 20, 1974).

2. Senator Hart stated in a letter to each senator that "[i]f informants' anonymity—whether paid informers or citizen volunteers—would be threatened, there would be no disclosures. . . ." Source Book, *supra*, at 351. Following the President's veto he stated:

 [t]he major change in conference was the provision which permits law enforcement agencies to withhold "confidential information furnished only by a confidential source." In other words, the agency not only can withhold information which would disclose the identity of a confidential source, but also can provide blanket protection for any information supplied by a confidential source. The President is therefore mistaken in his statement that the FBI must prove that disclosure would reveal an informer's identity; all the FBI has to do is to state that the information was furnished by a confidential source and it is exempt.

 Source Book, *supra*, at 451. Senator Kennedy stated that "we also provided that there be no requirement to reveal not only the identity of a confidential source, but also any information obtained from *him* in a criminal investigation." *Id.* at 459 (emphasis added). Senator Byrd stated he had been concerned that "informer"

jority agrees that Congress intended to protect law enforcement efforts. I do find throughout the legislative debates broad statements by Senators Hart and Kennedy to the effect that law enforcement would in no way be hampered by the amendment of subsection (b)(7). *See id.* at 351, 365, 440, 459. We should not, however, allow broad statements of assurance made in floor debate to control the clear language of the Committee report, language supported by statements of both senators indicating that they understood that "source" referred to persons or individuals. *See id.* at 351, 459. I think it is clear that "source" was not meant to include foreign, state, and local law enforcement agencies. Although there was considerable testimony pertaining to law enforcement difficulties that could result from this interpretation, this does not allow us to ignore congressional intent. We are not judging what should have been done but what was done. The law enforcement problem resulting from interpreting "source" as individuals, which undoubtedly is real, should be addressed to the Congress rather than to the courts.

The government argues that the question whether "source" should include foreign, state, and local law enforcement agencies "simply did not arise." This is not, however, a case of legislative silence, but one in which Congress did speak and specified the scope of the term in question. Especially persuasive is the fact that Congress was creating exceptions to a rule of disclosure. We should be reluctant under these circumstances to view an omission as anything but deliberate. I conclude that in light of *Train v. Colorado Pub. Interest Research Group, supra*, 426 U.S. at 9–10, 23–24, 96 S.Ct. 1938, we are required to give the term the meaning Congress intended it to have in spite of its facially plain meaning to the contrary.

### III

This conclusion is consistent with the purposes of the Act in general. The Supreme Court has emphasized that the " 'basic policy' " of the Act "is in favor of disclosure." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 220, 98 S.Ct. 2311, 57 L.Ed.2d 219 (1978) (quoting *Department of Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976)); *accord, Theriault v. United States*, 503 F.2d 390, 392 (9th Cir. 1974). While this consideration is not determinative in this case, it is worth pointing out that a restrictive reading limits the meaning of "source" to persons and thus favors disclosure over secrecy.

Finally, my brethren contend that a restrictive reading of "source" could easily be circumvented by agency use of individual agents to convey information, thus rendering the restrictive construction "absurd." Such a position assumes, however, that an agent acting in such a capacity would not be viewed as acting for the agency, a decision we need not make at this juncture.

Because we are required by law to examine legislative history in construing "confidential source," and because that history clearly reveals that Congress intended to protect only human sources from disclosure, I would reverse.

---

could have been construed to mean "paid informer," but said he would vote for the bill, with the (b)(7)(D) amendment, in part because "confidential source" would "assure that the identity of a *person* other than a paid informer may be protected." *Id.* at 468 (emphasis added).

Senators Hruska and Thurmond were members of the Conference Committee but did not sign its report. In opposing the amendment, they expressed fears that reprisals and a loss of sources would result, but were apparently concerned about individuals. *See id.* at 340–41, 343, 348, 456–57. But these senators' opposition comments are less probative because opposition arising out of a concern for the adequacy of protection of individuals would not necessarily indicate they believed agency sources were not covered by the amendment.