KENAI PENINSULA BOROUGH, a Municipal Corporation, Plaintiff-Cross-Complainant-Appellant,

v.

STATE OF ALASKA, Plaintiff-Appellee

v.

Cecil D. ANDRUS, Secretary of the Interior, et al., Defendant-Appellee.

KENAI PENINSULA BOROUGH, a Municipal Corporation, Plaintiff-Cross-Complainant-Appellee,

v.

STATE OF ALASKA, Plaintiff,

v.

Cecil D. ANDRUS, Secretary of the Interior, et al., Defendant-Appellant.

Nos. 77–3265, 78–1443.

United States Court of Appeals, Ninth Circuit.

Feb. 5, 1980.

Charles K. Cranston, Anchorage, Alaska (argued), for plaintiff-appellant; Gallagher, Cranston & Snow, Dan E. Dennis, Asst. U. S. Atty., Anchorage, Alaska, on brief.

Before CHAMBERS and TANG, Circuit Judges, and THOMPSON,* District Judge.

TANG, Circuit Judge.

These consolidated actions were brought to determine the proper distribution of revenues from federal oil and gas leases on reserved public lands within the Kenai National Moose Range, Alaska, a part of the National Wildlife Refuge System. Appellants herein, Kenai Peninsula Borough (Kenai) and the Secretary of the Interior, Secretary of the Treasury, and the Comptroller General (federal defendants) seek distribution pursuant to the Act of June 15, 1935, as amended, 16 U.S.C. § 715s (1976) [1] (Wildlife Refuge Revenue Sharing Act). The State of Alaska (Alaska) seeks distribution pursuant to the Mineral Leasing Act of 1920, as amended, 30 U.S.C. § 191. The district court, in a decision reported at 436 F.Supp. 288 (D. Alaska 1977), granted summary judgment in favor of Alaska.

We affirm.

## FACTUAL AND STATUTORY BACKGROUND

The opinion of the district court should be consulted for a more detailed rendering of the legislative background. A brief account will suffice here. The Kenai National Moose Range was created in 1941 by the reservation of land in the public domain.[2] The Mineral Leasing Act is the statute governing mineral leases on reserved public lands generally. Under the Act, from 1957 and 1958 until the events leading to this lawsuit, Alaska received 90% of the net revenues from oil and gas leases in the Kenai Range, while the remaining 10% accrued to the U. S. Treasury. 30 U.S.C. § 191.[3]

The Wildlife Refuge Revenue Sharing Act, 16 U.S.C. § 715s governs the distribution of revenues only from lands in the National Wildlife Refuge System. It provides that revenues from refuge lands go into a separate fund, and that these revenues then be divided between the local county in which the land is situated (25%) and the Wildlife Refuge Fund (75%). Prior to 1964, the distribution schemes of the Mineral Leasing Act and the Wildlife Refuge Revenue Sharing Act were not in conflict because the list of revenue sources in the Wildlife Refuge Revenue Sharing Act did *not* include the sale or other disposition of *minerals* on the refuge lands.

Amendments in 1964, however, made significant alterations in the distribution scheme of 16 U.S.C. § 715s(c) and added the word "minerals" to the list of revenue sources in 16 U.S.C. § 715s(a). Although the addition of "minerals" to the Wildlife Refuge Revenue Sharing Act created a *prima facie* conflict between the allocation schemes of the two acts for mineral reve-

---

* Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation.

1. References to § 715s are to the section as it existed in 1976. In 1978, the section was amended in several respects. The substance of these changes has no impact on the issue in this case; but some of the paragraphing of the section has been altered. *But see* footnote 6 *infra*.

2. Reserved public domain lands are public domain lands, never in state or private ownership, which have been set apart and reserved for a specific purpose. Public lands set apart for wildlife refuges are often described simply as reserved lands. Land in the Wildlife Refuge System may also be acquired. Acquired lands are those granted or sold to the United States by a state or citizen.

3. The Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351–359, governs the distribution of revenues from oil and gas leases on acquired lands. It provides that lease revenues "be distributed in the same manner as prescribed for other receipts from the land affected by the lease." *Id.* § 355. Thus, for mineral leases on acquired lands there is no conflict with the Wildlife Refuge Revenue Sharing Act.

nues on reserved refuge land, the legislative history of the amendments shows no awareness of the significance of the change. The legislative history is concerned exclusively with the proposed alterations within the distribution scheme of the Wildlife Refuge Revenue Sharing Act. Moreover, the Interior Department, which is charged with the administration of these provisions, over the years since 1964 until 1975 gave no studied attention to the conflict and continued to distribute the Kenai Refuge oil and gas lease revenues to Alaska according to the Mineral Leasing Act.

In 1975, in response to a request by the Director of the Fish and Wildlife Service, the Solicitor of the Interior Department issued an opinion that the 1964 addition of "minerals" to the Wildlife Refuge Revenue Sharing Act should control the distribution of oil and gas revenues on reserved refuge land, superseding the contrary provisions of the Mineral Leasing Act. The Comptroller General concurred in this conclusion. 55 Comp.Gen. 117. After objection by Alaska and reconsideration by the Solicitor and the Comptroller General, the Comptroller reaffirmed the original conclusion. Thereafter these lawsuits were initiated. All federal distribution of Kenai Moose Range oil and gas revenues ceased at the end of 1976, pending the outcome of this litigation.

## ISSUES

Upon appeal, on behalf of Kenai and the federal defendants, it is argued that the addition of the term "minerals" to the list of revenue sources in 16 U.S.C. § 715s(a) and the scheme of distribution contemplated in 16 U.S.C. § 715s(c) are of clear enough application that, in the absence of an expression of contrary meaning in the legislative history, the statute should be construed literally. If the amended version of § 715s is construed literally, it conflicts with the Mineral Leasing Act. And both because it is the later of two conflicting statutes and because it is the more specific of a specific and a general statute, the Wildlife Refuge Revenue Sharing Act should control the

distribution of these oil and gas revenues. The appellant also argues that the Interior Department and the Comptroller General 1975 opinions interpreting the statutes are entitled to deference.

Alaska, on the other hand, argues that "minerals" in the Wildlife Refuge Revenue Sharing Act should be read restrictively so that the term applies only to mineral revenues on acquired refuge lands and not to those from reserve refuge lands. Alaska cites certain incidents in the legislative history of the 1964 amendments and claims they show that Congress did not intend that the addition of "minerals" would alter prior law. Alaska also urges (1) that the appellants' literal interpretation is contrary to the Interior Department's interpretation in practice from 1964 to 1975 when revenues were distributed according to the Mineral Leasing Act; (2) that in 1976 Congress reenacted the Alaska distribution section of the Mineral Leasing Act, without modification or comment, after 11 years of agency interpretation and at a time when clarification of the statute would otherwise have been sought, thereby showing congressional intent that the Mineral Leasing Act cover *all* reserved land; and (3) that a literal construction here causes potential interpretive difficulties with other statutes, chiefly the Alaska Statehood Act, Pub.L. No. 85–508, 72 Stat. 339, 48 U.S.C. Note preceding § 21, and the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. § 1608.

## DISCUSSION

■ The difficulty here results from the addition of but one word, the term "minerals," to a catalog list of revenue sources in 16 U.S.C. § 715s(a). The parties agree that this addition creates an apparent conflict between the two statutory provisions involved. The touchstone to the resolution of the conflict is to ascertain the intent of Congress: by the addition of the term "minerals" in 16 U.S.C. § 715s(a), what effect, if any, did Congress intend to have on the distribution of mineral revenues on re-

served refuge lands under 16 U.S.C. § 715s(c) or 30 U.S.C. § 191?

Appellant Kenai, relying on *Caminetti v. United States,* 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917), argues that 16 U.S.C. § 715s is clear and unambiguous on its face and therefore that resort to legislative history or other extraneous sources is inappropriate. *See also United States v. Wilson,* 591 F.2d 546, 547 (9th Cir. 1979); *Adams v. Morton,* 581 F.2d 1314, 1320 (9th Cir. 1978), *cert. denied, Gros Ventre Tribe of Fort Belknap Indian Reservation, Montana v. United States,* 440 U.S. 958, 99 S.Ct. 1498, 59 L.Ed.2d 771 (1979). It is true that under the plain meaning of minerals and of the other provisions of § 715s, its language fairly brings the Kenai Moose Range oil and gas revenues within its scope, if § 715s is read in isolation.

■ However, when a plain meaning reading of a statute brings that statute into conflict with another statute and disrupts a preexisting network of statutory provisions, it is appropriate to look to the legislative history for help in ascertaining congressional intent. *See Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 9–10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *Church of Scientology v. U.S. Department of Justice,* 612 F.2d 417, 420–422 (9th Cir. 1979). *Cf. Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978); *Commissioner v. Brown,* 380 U.S. 563, 571, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965) (ability of courts to adopt restricted meaning of word when usual meaning leads to absurd results); *League to Save Lake Tahoe, Inc. v. Trounday,* 598 F.2d 1164, 1173 (9th Cir. 1979) (resort to legislative history proper when words of statute are not con-

clusive as to legislative intent); *Get Oil Out! Inc. v. Exxon Corp.,* 586 F.2d 726, 729 (9th Cir. 1978) (court obligated to construe federal statutes so that they are consistent with each other). This is especially true when the face of the statute gives no indication of a congressional intent to repeal existing legislation or of a purpose, the accomplishment of which might require superseding prior statutes.

■ Unfortunately, the legislative history of the ·1964 amendments to 16 U.S.C. § 715s sheds no direct light on the issue here. The principal purpose of the 1964 amendments was to improve the distribution scheme for revenues from acquired refuge land, so that local authorities would more likely approve of federal acquisition of wildlife refuge land. *See,* H.R.Rep. No. 1753, 88th Cong., 2d Sess., *reprinted in* [1964] *U.S.Code Cong. & Admin.News,* p. 3265. Accordingly, the addition of "minerals" occurred without comment; and potential conflict with the Mineral Leasing Act went unremarked. Of course, the mere fact that Congress was silent when one would have expected comment does not necessarily mean that an alteration in revenues from mineral leases was not intended by Congress.[4] Similarly, details in other portions of the legislative history from which there can be consistently implied an assumption that the prior revenue distribution would not be altered, are not in themselves dispositive.[5]

Since a literal reading of § 715s creates apparently unanticipated and non-productive difficulties with other statutes and the legislative history of the statute does not resolve the issue, it is nearly impossible to determine with confidence what was Con-

---

4. *Cf. Scripps-Howard Radio, Inc. v. Federal Communications Commission,* 316 U.S. 4, 11, 62 S.Ct. 875, 880, 86 L.Ed. 1229 (1942) ("The search for significance in the silence of Congress is too often the pursuit of a mirage.").

5. The district court discusses these incidents. 436 F.Supp. at 292. Alaska also relies on these incidents. However, those items of legislative history show, at most, only that Congress had

no express awareness that the addition of "minerals" might alter prior law. It is too far a jump to conclude further that Congress positively intended no change. *But see* footnote 7 *infra.* These incidents of legislative history in themselves cannot be dispositive of the issue here because they are connected only tenuously to the question of the intended distribution scheme and cannot be read in effect as a statement of congressional intent.

gress' intent in passing the 1964 amendments.[6]

The appellants urge us to find that the later Wildlife Refuge Revenue Sharing Act has repealed by implication the earlier Mineral Leasing Act as to revenues from refuge lands. Repeal by implication, however, is not favored; if possible, statutes should be read so as to give effect to each of them. *Morton v. Mancari,* 417 U.S. 535, 549–51, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936); *United States v. Jones,* 607 F.2d 269, 272 (9th Cir. 1979); *United States v. Burnett,* 505 F 2d 815, 816 (9th Cir. 1974), *cert. denied,* 420 U.S. 966, 95 S.Ct. 1361, 43 L.Ed.2d 445 (1975). This is the preferred course especially when, as here, the purpose and legislative history of the later act gives no clear foundation for an implied repeal.[7] There can be no implied repeal unless the intention of the legislative body to repeal is clear. *Morton v. Mancari, supra; United States v. Georgia-Pacific Co.,* 421 F.2d 92, 102 (9th Cir. 1970). If possible, we seek an interpretation of the later act which will harmonize it with the Mineral Leasing Act and cause least disruption to the other related statutes.

The stated purpose of the 1964 amendments to the Wildlife Refuge Revenue Sharing Act was to facilitate the acquisition of lands from local owners, with the approval of local governing authorities. The focus of attention, therefore, was the treatment under the Act of *acquired* lands. Accordingly, we hold that the 1964 addition of "minerals" to the Wildlife Refuge Revenue Sharing Act must be read to be applied only to acquired refuge lands and not to reserved refuge lands. This interpretation is warranted because to hold otherwise is to find an implied repeal when Congress has expressed no clear intent. It also harmonizes the operation of the two statutes and gives effect to both. Further, it avoids other potential conflicts with the Alaska Statehood Act and the Alaska Native Claims Settlement Act. This interpretation also draws support from the fact that the department construed the statute this way in practice between 1964 and 1975, which practice we are not wont to disregard as merely eleven years of inadvertent statutory construction by the agency.[8]

**6.** Ideally, in most situations where a statute has a potential for conflict with another prior statute, either the statute itself or the legislative history will contain enough indication of purpose and congressional intent that the matter can be resolved there. In fact, the question of the meaning of "minerals" in § 715s and its application to mineral lease revenues on reserve refuge land was before Congress in 1978. In the course of a major reworking of § 715s, it was proposed to clarify this question so that oil and gas revenues from refuge lands were to be governed by § 715s, and not by 30 U.S.C. § 191, at least from the date of the 1978 enactment. Finally, however, the Senate Committee on Environment and Public Works noted that the issue was currently being determined in the instant case and preferred to leave the statute in its original form, pending the outcome of this litigation. "The Committee believes it is inappropriate to legislate on this matter pending a determination by the court, and takes no position as to whether disposition of mineral revenues should be made pursuant to the Mineral Leasing Act or the Refuge Revenue Sharing Act." S.Rep. No. 95–1174, 95th Cong., 2d Sess. 4, *reprinted in* [1978] *U.S.Code Cong. & Admin. News,* pp. 2979, 2982. *See also Id.* at 8, *re-*

printed in [1978] *U.S.Code Cong. & Admin. News* at pp. 2985–86 (additional views).

**7.** The few items of legislative history which do exist, *see* footnote 5 *supra,* give support to the position that Congress did not clearly intend an implied repeal. But even without them, such intent would still be absent.

**8.** The department did change its interpretation in 1975. *See* page 1212 *supra.* The appellants argue that the department's new interpretation is entitled to the customary deference shown to agency interpretations under *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). They further argue that the most recent departmental interpretation is equally entitled to deference- despite the fact that it is a change of position, citing *Andrus v. Sierra Club,* 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979), and *Montana Power Co. v. Environmental Protection Agency,* 608 F.2d 334 (9th Cir. 1979). But in *Sierra Club,* the change of interpretation occurred in the context of a comprehensive change from advisory guidelines to mandatory regulations. And in *Montana Power,* the agency's changed interpretation of *its own regulations* was involved. Here we do not have even a change in

Because clear congressional intent to effect a repeal by implication has not been shown and because the interpretation of the two statutes adopted by the district court and by this court gives effect to both statutes, the judgment of the district court is affirmed.

Affirmed.

an agency's regulations implementing a statute. Rather it is a case of the agency's interpretation of a single term in a statute. In this context the term is neither a term of art nor one whose interpretation requires that deference be shown to the expertise of those charged with administering the operation of the statute. *Cf. General Electric Co. v. Gilbert*, 429 U.S. 125, 142–43, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (less deference to administrative guidelines when they conflict with earlier agency pronouncements).