Patricia F. PETERSON, on behalf of herself and for the public, Plaintiff,

v.

WELLS FARGO BANK, National Association, a national banking association, Defendant.

No. C–80–2764 WHO.

United States District Court, N.D. California.

Oct. 19, 1981.

Lynn S. Carman, San Rafael, Cal., McGuinn & Moore, San Francisco, Cal., for plaintiff.

David J. Brown, Kent M. Roger, Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant.

## OPINION

ORRICK, District Judge.

In this action for mandamus and injunctive relief, plaintiff, a credit cardholder of defendant, Wells Fargo Bank (the "Bank"), a national banking association organized under and pursuant to the National Bank Act, 12 U.S.C. § 21 *et seq.*, challenges the Bank's power to increase the annual finance charge on the outstanding balances of its customers who hold Master Charge or VISA credit cards and charges it with "unfair competition" under § 17200 *et seq.* of the California Business and Professions Code.[1] Defendant filed a motion for summary judgment and plaintiff responded· with a cross-motion for summary judgment.[2] For the reasons discussed below, the Court grants the Bank's motion for summary judgment and denies plaintiff's cross-motion for summary judgment.

### I

### A

The seeds of this dispute were planted when Congress enacted the Credit Control Act in 1969, 12 U.S.C. § 1901 *et seq.* (the "Act"), which empowers the President to

---

1. Section 17203 of the California Business and Professions Code provides:

   "Any person performing or proposing to perform an act of unfair competition [as defined by § 17200] within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

   "Unfair competition" is defined by § 17200 as: "[U]nlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."

2. At the hearing on both motions for summary judgment, counsel stipulated that there were no genuine issues of material fact in dispute and that the matter could be resolved on these motions.

authorize the Board of Governors of the Federal Reserve System (the "Board") to regulate credit when the President deems such regulation necessary to control inflation. *See* 12 U.S.C. § 1904. The Act lists broad categories of action which the Board may take in response to a Presidential directive.[3]

Pursuant to the Act, President Carter issued Executive Order No. 12201 on March 14, 1980, directing the Board to "establish uniform requirements for changes in terms in open-end credit accounts for consumer credit" for the purpose of "preventing and controlling inflation generated by the extension of credit in an excessive volume * * *."

The Board, in turn, promulgated 12 C.F.R. § 229.6,[4] which permits a creditor to change the terms of an open-end credit

**3.** 12 U.S.C. § 1905 provides:

"The Board, upon being authorized by the President under section 1904 of this title and for such period of time as he may determine, may by regulation

(1) require transactions or persons or classes of either to be registered or licensed.

(2) prescribe appropriate limitations, terms, and conditions for any such registration or license.

(3) provide for suspension of any such registration or license for violation of any provision thereof or of any regulation, rule, or order prescribed under this Act.

(4) prescribe appropriate requirements as to the keeping of records and as to the form, contents, or substantive provisions of contracts, liens, or any relevant documents.

(5), prohibit solicitations by creditors which would encourage evasion or avoidance of the requirements of any regulation, license, or registration under this Act.

(6) prescribe the maximum amount of credit which may be extended on, or in connection with, any loan, purchase, or other extension of credit.

(7) prescribe the maximum rate of interest, maximum maturity, minimum periodic payment, maximum period between payments, and any other specification or limitation of the terms and conditions of any extension of credit.

(8) prescribe the methods of determining purchase prices or market values or other bases for computing permissible extensions of credit or required downpayment.

(9) prescribe special or different terms, conditions, or exemptions with respect to new or used goods, minimum original cash payments, temporary credits which are merely incidental to cash purchases, payment or deposits usable to liquidate credits, and other adjustments or special situations.

(10) prescribe maximum ratios, applicable to any class of either creditors or borrowers or both, of loans of one or more types or of all types.

(A) to deposits of one or more types or of all types.

(B) to assets of one or more types or of all types.

(11) prohibit or limit any extensions of credit under any circumstances the Board deems appropriate."

**4.** 12 C.F.R. § 229.6 provides:

"§ 229.6. *Change in terms of open-end credit accounts.*

(a) Notwithstanding the terms of any open-end credit agreement or the provision of any other law, a covered creditor, with respect to its open-end credit accounts, may (1) impose or increase any finance or other charge, (2) change the method of computing the balance upon which charges are imposed, or (3) increase the required minimum periodic payment, if the following two conditions are met. First, the covered creditor shall mail or deliver a written notice of the change to each affected consumer accountholder at least 30 days before the effective date of the change. Second, the covered creditor shall permit each affected consumer accountholder to repay, under the existing account terms, any debt incurred prior to the effective date of the change, unless the accountholder incurs additional debt on or after that date or otherwise assents in writing to the changes.

(b)(1) This section does not authorize a covered creditor to impose a rate of interest or finance charge in excess of the maximum permitted by law.

(2) This section does not govern any change in the terms specified in paragraph (a) of this section if the covered creditor began mailing or delivery notice of that change to affected consumer accountholders before March 14, 1980.

(c)(1) The notice required by this section shall clearly set forth the new term(s), the corresponding existing term(s), and the effective date of the change shall appear on a single document that contains no other information except the changed account agreement or other material directly related to the change; and shall be in plain language.

(2) The notice also shall clearly explain the two options available to the consumer. The options shall be presented more conspicuously than the rest of the notice by, for example, bold-faced type, larger type size, or contrast-

account as it applies to an existing balance upon thirty-days notice to the consumer notwithstanding any credit agreement or law to the contrary. However, the regulations do permit one exception: if the consumer refrains from purchasing on credit after the effective date of the new terms, he or she may repay the existing debt under the old terms. Only when the consumer incurs additional debt after the effective date of the change will the existing balance be affected by the new terms.

In May, 1980, the Bank sent to those of its customers who hold Master Charge or VISA credit cards a letter and a separate notice enclosed in the same envelope informing them that, among other changes, the annual finance charge would be increased from 18 percent to 20 percent as of July 15, 1980, and that if the customers charged any purchase on or after July 15, 1980, the 20 percent annual charge would apply to both new purchases and the existing balance from purchases made before July 15, 1980.[5] The customers were further informed that those who did not use their credit cards after July 15 could continue to pay off their balance with a finance charge of 18 percent.

### B

Plaintiff filed suit in California state court[6] under § 17204 of the California Business and Professions Code which gives any person acting in his or her own interest or on behalf of the general public the right to enjoin "unfair competition." Unfair competition is defined as an "unlawful, unfair or fraudulent business practice." Plaintiff contends that the Bank has engaged in such unfair competition by increasing the finance charge on the existing or outstanding balance with the following illegal results:

1. The finance charge increase applicable to the existing balance violates the Truth In Lending Act, 15 U.S.C. § 1637(a) ("TILA"), which requires a creditor to disclose the conditions and method of imposing finance charges to the debtor before opening a consumer credit account.

2. The Bank also violated TILA by not disclosing the true annual finance charge on post-July 15, 1980, purchases, which may be considerably higher than 20 percent when the finance charge increase on the existing balance is factored in.

3. The Bank's form of notice informing customers of the finance charge increases which accompanied a cover letter did not conform with 12 C.F.R. § 226.1 *et seq.,* the so-called Regulation Z issued by the Board, which requires a clear notice in a single document.

4. The Bank's form of notice also violated § 17500 of the California Business and Professions Code[7] because of its misleading nature.

---

ing color. Language similar to the following, or modified to reflect the creditor's individual credit plan, may be used:

'WARNING: Continued use of your account on or after [effective date of change] will result in stricter terms.

You have TWO OPTIONS:

(1) You may stop making charges on your account before [effective date of change] and pay off under the existing terms described in this notice all or any part of what you owe us on that date. You may continue to use your account on or after that date, but if you do so, the new terms will apply as explained in option (2) below. OR

(2) You may make charges on your account on or after [effective date of change] in which case the new terms described in this notice will apply to what you then owe us and to future charges.' "

**5.** *See* Appendix A to this Opinion. The letter and notice sent to Master Charge cardholders were identical.

**6.** Defendant removed this case from state court on the grounds of federal question jurisdiction.

**7.** Section 17500 provides:

"It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any

5. The conditioning of credit after July 15, 1980, upon an increase in the finance charges applied to the existing balance is an illegal tying arrangement prohibited by 12 U.S.C. § 1972(1)(C).[8]

6. The Bank violated the Unruh Act, California Civil Code § 1801 *et seq.*, which prohibits retail sellers or assignees from charging more than an 18 percent annual finance charge on the first $1,000 unpaid balance of a retail installment contract or more than 12 percent on the excess balance. Cal.Civ.Code § 1810.2. Plaintiff contends that the Bank comes within the scope of the Unruh Act as either a retail seller acting in conjunction with a merchant or as a "holder" which purchases the credit sales draft from the retail seller.

7. If § 1801.6 of the Unruh Act exempts bank credit card transactions from its coverage, it violates the California Constitution, Article IV, Section 16, which requires uniform operation of general statutes.

8. The Bank violated its common law duty as a public service corporation not to arbitrarily discriminate between customers by charging customers who open credit card accounts after July 15, 1980, a 20 percent annual finance charge while charging all other customers a 20 percent finance charge on new purchases plus an additional 2 percent on the outstanding balance.

## C

Defendant removed this case from state court on the basis of the allegations of the TILA and 12 U.S.C. § 1972 violations. Although plaintiff initially moved for remand, and the parties fully briefed the jurisdictional issue, plaintiff later withdrew her motion. She now claims that her first two causes of action relating to the TILA and § 1972 plead a federal and state cause of action simultaneously. (Status conference memorandum filed Nov. 12, 1980.)

■ The Court has subject matter jurisdiction under 28 U.S.C. § 1331 over claims one through four of the complaint on two grounds. First, the Court accepts plaintiff's representation that she is pleading a cause of action under federal law in her claims pertaining to the TILA and § 1972. Second, even if the plaintiff has technically pleaded a state cause of action under § 17200 *et seq.* of the Business and Professions Code relating to the TILA and § 1972 allegations, the Court has federal question jurisdiction under the standard of *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577 (1921), as follows: Federal questions appear on the face of the complaint, that is, whether the Bank has violated the TILA or § 1972; the federal issues are substantial; and the federal questions are the essential and pivotal elements of plaintiff's cause of action because the state statute merely provides an alternative, if not cumulative, remedy for a violation of a federal statute. The state law imposes no obligations in addition to those required by the federal statutes, and a

newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, any statement, concerning such real or personal property or services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any such person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell such personal property or services, professional or otherwise, so advertised at the price stated therein, or as so advertised. Any violation of the provisions of this section is a misdemeanor punishable by imprisonment in the county jail not exceeding six months, or by a fine not exceeding two thousand five hundred dollars ($2,500), or by both."

8. 12 U.S.C. § 1972 provides in part:
"(1) A bank shall not in any manner extend credit * * * or fix or vary the consideration for any of the foregoing, on the condition or requirement—
　　*　　*　　*　　*　　*　　*
(c) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service; * * *."

plaintiff need only show a violation of the federal statute to prove liability under § 17200 *et seq.*

■ The Court has jurisdiction under 28 U.S.C. § 1331 over those claims challenging the rate of interest the Bank may charge because the interest rates of national banks are governed by federal law even though such law incorporates state law standards. *Marquette National Bank v. First of Omaha Service Corp.,* 439 U.S. 299, 308, 99 S.Ct. 540, 545, 58 L.Ed.2d 534 (1978).[9]

■ The Court exercises pendent jurisdiction over the remaining state claims because they challenge the same action taken by the Bank.

## II

### A

As its first defense to plaintiff's contentions that a finance charge increase on an existing balance is illegal, the Bank points to the Board's regulation, 12 C.F.R. § 229.6, which authorizes such an increase regardless of any open-end credit agreement or law to the contrary. Plaintiff, however, challenges the Board's power to preempt existing laws. Although the regulation does run afoul of some state laws,[10] the Court need not decide the issue of the regulation's validity because it finds that the regulation does not violate any laws pertinent to the facts of this case.

Plaintiff raises several claims under the TILA. First, she contends that an increase in the finance charge on the existing bal-

ance, regardless of the terms of any open-end credit agreement between the Bank and the customer, violates 15 U.S.C. § 1637 and 12 C.F.R. § 226.7(a)(1), which require a creditor to disclose to the customer in a single written statement before the first credit transaction the conditions under which a finance charge may be imposed. This charge lacks merit. The Bank has complied with this regulation by including the following paragraph in its Master Charge disclosure statement which plaintiff signed in January, 1980:

"13.  Bank may change the terms of this agreement, including the FINANCE CHARGE rate applicable to existing obligations as well as future transactions, by giving Customer written notice as required by law. Customer agrees that the new terms shall apply to the Account in all respects if, after the effective date of the change, Customer continues in possession of Master Charge cards issued on the Account or uses the Account. If the change is an increase in the FINANCE CHARGE rate applicable to existing balances due and Customer returns all Master Charge cards issued on the Account with a request that they be cancelled as a result of the change, Customer shall continue to pay off any obligations then owing on the Account in accordance with the terms of the agreement as it existed prior to such change, otherwise the existing balances due shall be paid off in accordance with the changed terms."[11]

Plaintiff asserts that the TILA "unquestionably" freezes the financing charge rate at the rate disclosed at the time of pur-

---

**9.** *See* discussion *infra* at 1108.

**10.** *See, e.g.,* Utah Code Ann. 70B–3–408(3)(d) which requires all finance charge increases to be prospective only.

**11.** Appendix A5 to defendant's memorandum of points and authorities in support of motion to dismiss plaintiff's petition for a writ of mandamus and complaint for injunction. Defendant's VISA customer agreement is identical. *See* Appendix A6. The Bank included a similar provision in its customer agreement which plaintiff had signed in June, 1977, but which did not give the customer the option of paying off the balance at the old rate:

"14. Bank may amend, modify, add to, or delete from these terms and conditions, including the method of application and the amount of the FINANCE CHARGE rates, effective both as to any balances then outstanding and as to any future transactions by mailing a notice of the change to any Customer whose name appears on the card or account, at the address on Bank's records. Bank will mail the notice a minimum of 15 days prior to the beginning of the statement billing period in which the change is to occur."

chase, while only authorizing a change in the rate as to future purchases. The Court does not read the statute and regulations with such assurance. 12 C.F.R. § 226.7(f) merely sets forth the *procedure* for notifying customers of open-end credit accounts of changes in terms but is silent on whether the changes may be applied to the old balance. 12 C.F.R. § 226.9(6)(iii), however, permits a customer under an open-end credit account secured by the customer's real property to refuse a change in terms and repay any existing obligation under the then-existing terms of the account. The creditor, in turn, need not extend further credit on the account.[12] The Court interprets the silence of Regulation Z on such changes in terms for unsecured open-end credit accounts to mean that the Bank and customer may reach an agreement among themselves. The Bank's current customer agreement provides the same right of "rescission" as does the Regulation Z for secured accounts.

Second, plaintiff argues that the Bank failed to disclose the true amount of the finance charge increase on new credit because a customer with a large outstanding balance who charges an inexpensive item after July 15, 1980, will incur a finance charge on the item in excess of 20 percent when the increase on the outstanding balance is factored into the amount. Plaintiff's faulty analysis of the applicable statutes and regulations is illustrated by her example of the teddy bear purchase. Plaintiff suggests, as an example, that if a customer with a $1,000 outstanding balance purchased a $10 teddy bear on or after July 15, 1980, she would pay a total of $22 in finance charges: an additional 2 percent on the balance ($20) and 20 percent on the $10 purchase ($2). The $22 thus is a finance charge of 220 percent on $10 credit. She mistakenly attributes the $20 increase to the new purchase rather than to the outstanding balance. Although the new purchase triggers the $20 increase, it is not the sum upon which the 2 percent increase is determined. Thus, plaintiff cannot use the $10 purchase as the balance upon which to calculate the "true" finance charge. At bottom, plaintiff is complaining that customers may not grasp the full significance of the first post-July 15, 1980, purchase. But that complaint is more properly addressed below in the Court's review of the Bank's notice.

◼ Plaintiff's cursory argument against the form of notice sent by the Bank to VISA and Master Charge customers in May, 1980, is that "[b]y any view, the 'disclosures' of bank in May 1980 are *not* 'adequate notice', within the meaning of 15 U.S.C. Section 1602(j)." Plaintiff's points and authorities in support of alternative motion of plaintiff for summary judgment at 9. The notice is sufficient. It is headed by the following caption in large, thick capital letters: NOTICE OF CHANGE IN TERMS IN WELLS FARGO VISA ACCOUNTS EFFECTIVE JULY 15, 1980. Below, in a box with print which is larger and darker than the text of the notice, is a warning about the applicability of the new terms to the outstanding balance. This language was reproduced *verbatim* from wording suggested in 12 C.F.R. § 229.6. The Board's opinion that this language provides adequate notice is entitled to great weight. *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 567, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980). Mindful that this regulation was not issued pursuant to TILA, the Court still finds the warning clear and unambiguous.

The Bank's notice included additional language stressing that the customer has an option of paying off the outstanding balance at the old rate on the back side. *See* Appendix A to this Opinion.

◼ Plaintiff's claim brought under § 17500 of the California Business and Professions Code also fails because the form of

---

12. The regulations note that 12 C.F.R. § 226.-9(g)(6) was scheduled to expire in March of 1980. However, it has been extended while the Board devises new regulations on rescission for open-end credit accounts.

notice is not misleading as explained above.[13]

### B

The 1970 Tie-In Amendments to the Bank Holding Company Act (the "Tie-In Act") make it illegal for a bank to condition the extension of credit by the requirement that the customer provide additional credit, property or service to the bank other than that related to and usually provided in connection with a loan. 12 U.S.C. § 1972. Plaintiff claims that the Bank violated the Tie-In Act by conditioning its grant of credit after July 15, 1980, with the requirement that cardholders pay an additional 2 percent finance charge on their existing balance. As evidence that the finance charge increase is not a traditional banking practice, plaintiff submits the deposition of Ms. G.L. Husby, Senior Vice-President in charge of the Credit Card Department at the Bank, who states that before May, 1980 (when the Board's regulation was issued), an increase in the finance charge on outstanding balances was illegal. (Husby deposition at 22.)

■ The Bank argues that because the customer agreed to the right of the Bank to increase the charge on outstanding balances in the original customer agreement, the Bank did not offer credit after July 15, 1980, on the condition that the customer agree to pay more for credit extended before that date. The fact that the customer agrees to the term at the outset does not necessarily take the agreement out of the realm of the Tie-In Act. *See Freidco v. Farmers Bank,* 499 F.Supp. 995, 1001 (D.Del.1980) (scope of § 1972 encompasses terms imposed in a single transaction); *Costner v. Blount National Bank,* 578 F.2d 1192, 1194 (6th Cir.1978) (court upheld a jury verdict which found liability under § 1972 where bank loan agreement required owner of automobile dealership to sell its retail commercial installment paper to the bank).

■ Although plaintiff's theory has superficial appeal, the Court finds that the Bank's financing arrangements are either not tie-ins or are consonant with traditional banking practices.

■ The purpose of the Tie-In Act is to "prohibit anticompetitive practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service they desire." S.Rep. No. 1084, 91st Cong., 2d Sess., reported in [1970] U.S.Code Cong. & Ad.News 5519, 5535. An increase in the amount of interest or finance charge is an integral part of the loan terms, rather than an additional requirement. For example, the Bank's customer agreement in effect June, 1977, granted the Bank the right to increase the finance charge without affording the customer the option of paying off the outstanding balance at the old rate. The increased finance charge was applied to the balance regardless of whether the customer subsequently charged any purchases.

The agreement in effect in January, 1980, was much less onerous: the customer could repay the balance at the old rate. This option did not then bifurcate the single bank product the customer wanted, that is, open-end credit, into two distinct products, post-July 15, 1980, credit and pre-July 15, 1980, credit. It simply gave the customer a right of rescission. By contrast, other suits brought under the Tie-In Act involved distinct products or terms. *See, e.g., Costner,*

---

**13.** Although the issue was not raised by plaintiff, the Court is more concerned that the inclusion of a cover letter with the notice might mislead or confuse the customer. The cover letter attempts to sweeten the bitter pill of the new terms by emphasizing that the Bank would not institute an annual fee for the use of Master Charge or VISA credit cards. It underlines unimportant passages and leaves some important information inconspicuous. 12 C.F.R. § 226.6(c) permits the creditor to supply additional information with a disclosure statement if it does not obscure or detract from the necessary information. Upon careful consideration, the Court finds that the cover letter did not detract from the notice. The notice is so prominently captioned that the customer could not fail to recognize that it contained important information. In addition, the cover letter directed the customer to the notice for a detailed explanation of the changes.

*supra* (bank required auto dealership, as a condition for a loan, to sell a share of its retail commercial auto installment paper to the bank and employ a person designated by the bank to ensure compliance with this term); *Swerdloff v. Miami National Bank,* 584 F.2d 54 (5th Cir.1978) (as a condition for continued financing, bank required shareholders of the borrowing corporation to sell 51 percent of their stock to another bank customer); *Sterling Coal Co. v. United American Bank,* 470 F.Supp. 964 (E.D.Tenn. 1979) (bank required borrower to use bank's legal counsel and required borrower to enter into an exclusive sales agreement with another company and prohibited the utilization of other banks' services).

Even if the finance charge terms could be considered a tying arrangement, the increase provision is related to the loan. The same factors which caused the Court to find that two separate products or terms were not present suggests that the increase in a finance charge is closely related to the original grant of credit. Whether this clause is "usually provided in connection with" open-end credit agreements is a closer question. Ms. Husby of the Bank's credit card division found it unusual because she assumed this provision was illegal before 12 C.F.R. § 229.6. The Board, in its summary preceding the regulation, stated that a minority of states prohibit the application of new terms to outstanding balances, while in the remaining states banks draw up their own terms.

The application of the terms to outstanding balances is not so unusual as to warrant finding liability under the Tie-In Act. Congress is concerned that banks will use their economic power to lessen banking competition or impose *competitively* unfair terms. The change in terms authorized by the Board and adopted by the Bank can promote competition. First, since the conditions for increasing the finance charges were explained in the customer agreement, the customer had the opportunity to compare the Bank's terms with those of other banks. Second, the customer had the opportunity of paying off the outstanding balance under the old terms while obtaining credit cards from another bank with a smaller finance charge. The customer was not faced with the Draconian choice of either accepting the new terms or paying off the balance immediately as in the case where a bank threatens to call in a loan unless the customer agrees to additional terms. *See, e.g., Swerdloff, supra.*

### C

The "most favored lender" provision of the National Bank Act, later codified as 12 U.S.C.A. § 85 (Cum.Supp.1981), permits national banks to charge the maximum interest rate on loans or other evidences of debt allowed to competing lending institutions by the laws of the state in which the national bank is located.[14] If the state permits a higher interest rate for a particular type of loan, a national bank may charge the higher rate for such loans. For example, a national bank may charge the rate of interest charged by small loan companies even though it could not be licensed as a small loan company, provided that the bank makes similar types of loans. 12 C.F.R. § 7.7310.

The Court must determine what California law governs the interest rate a bank may charge on its open-ended credit accounts pursuant to a credit card program. Interest generally accrues on two types of transactions: loans or sales on credit. Loans are governed by the usury provision of the California Constitution, Article 15, Section 1, which forbids interest rates for consumer loans in excess of 10 percent. However, state chartered and national banks are specifically exempted from this interest ceiling, subject to future legislative control. Since the state legislature has never regulated the amount of interest banks may charge, the rates are competitively determined by each bank.

---

**14.** Or the bank may set an interest rate of 1 percent in excess of the discount rate on ninety-day commercial paper in effect at the Feder-

al Reserve Board in the lending bank's district, whichever is greater.

■ *Bona fide* credit sales are not subject to the usury laws because they are considered to be the sale of products rather than loans. *Verbeck v. Clymer,* 202 Cal. 557, 562–63, 261 P. 1017 (1927); *Boerner v. Colwell Co.,* 21 Cal.3d 37, 45, 145 Cal.Rptr. 380, 577 P.2d 200 (1978). The interest rate on credit sales which meet certain criteria [15] is limited to 18 percent annually on the first $1,000 and 12 percent thereafter by the Unruh Act, Cal.Civ.Code § 1805.1.[16]

The parties devote much of their briefs to the characterization of the Bank's credit card program as a loan or credit sale. In reality, bank credit card programs cannot be squeezed into either mold. They are multiparty agreements of a hybrid nature, displaying characteristics of both loans and sales.[17]

A brief description of the Bank's credit card program highlights the difficulty the Court and others have in classifying the program as a loan or credit sale. First, a customer enters into an agreement with the Bank in which the Bank establishes a line of credit for the customer who may use the Bank's credit card to purchase goods or services or to obtain a cash advance. At that point, the Bank also sets the interest rate for extensions of credit.

A merchant who wishes to participate in the Master Charge or VISA programs enters into an agreement with a bank which is also a member of the programs. It may be Wells Fargo, but it could also be a number of other banks, not necessarily in San Francisco or California. The merchant agrees to pay a fee to the bank which handles the Master Charge or VISA program, which is usually a percentage of the merchant's monthly sales.

When a customer purchases an item from the merchant, the merchant fills out a Master Charge or VISA sales slip which the customer signs. If the amount of purchase exceeds a certain dollar limit, the merchant must call a clearing house to receive authorization which insures that the customer will not exceed the line of credit. Typically, the merchant will then deposit the charge slip with the bank ("merchant bank") which will, in turn, credit the merchant's account for the entire amount. If the merchant's bank is not Wells Fargo, it will forward the slip to a regional clearing house. If Wells Fargo is not within that region, the slip is further forwarded to the appropriate region. The clearing house then sends the slip to Wells Fargo, which reimburses the merchant's bank and bills the customer. Sometimes the merchant bank will also pay Wells Fargo a fee. All member banks must pay a fee to finance the clearing houses' operations.

When the customer receives his or her monthly bill, he or she has the option of paying the entire amount at once or paying in installments. If he or she elects the latter, the Bank will assess a finance charge on the unpaid balance. When the next monthly bill is issued, the balance reflects the previous unpaid balance and any new charges. The customer must pay a certain minimum amount, but may elect to use the Bank's credit for the remainder.

Even this simplified analysis reveals characteristics of both loans and credit sales. As with a loan, the merchant assumes none of the risks of financing the credit pur-

---

**15.** The credit agreement must (2) call for repayments in installments, with a finance charge or a discount if paid by cash or credit card; or (b) must provide for more than four installments. Cal.Civ.Code § 1802.6. Thus, the Unruh Act does not apply to all credit sales. *See Seibert v. Sears Roebuck & Co.,* 45 Cal. App.3d 1, 120 Cal.Rptr. 233 (1975) (retail merchant's credit plan, which requires the purchaser to repay in full within 30 days with no installments, is not a retail installment sale).

**16.** Although these credit card plans are often referred to as tripartite transactions, more than three parties are typically involved: a customer, a bank which issues the card to the customer, a merchant, the merchant's bank and several clearing houses. *See* Brandel & Leonard, *Bank Charge Cards: New Cash or New Credit,* 69 Mich.L.Rev. 1033, 1035 n. 5 (1971); *see also* discussion in text of Opinion *infra.*

**17.** The "most favored lender" clause applies to all forms of debts, including retail installment sales, and not only to loans. *United Missouri Bank v. Danforth,* 394 F.Supp. 774, 782–83 (W.D.Mo.1975).

chase. The merchant is paid the entire amount while the customer makes installment payments to the bank at a rate determined by the bank.[18] Unlike the loan transaction, however, the bank maintains a close relationship with the merchant, who must pay it, or another participating bank, a fee for facilitating the sale. Were it not for the credit card program, many small businesses could not extend credit to the customer. In the customer's eyes, the transaction differs little from using a retailer's credit card. The bank has simply taken over management of the credit account.

This inability to definitively relegate bank credit card programs to the ranks of loans or retail installment sales by analysis of the transaction has led to conflicting case law. Some courts have held bank credit card purchases to be, in substance, credit sales. *Acker v. Provident National Bank,* 512 F.2d 729 (3d Cir.1975); *Kass v. Central Charge Service,* 304 A.2d 632 (D.C.App. 1973); *Uni-Serve Corp. v. Commissioner of Banks,* 349 Mass. 283, 207 N.E.2d 906 (1965). Others have likened them to loans. *Fisher v. First National Bank of Omaha,* 548 F.2d 255 (8th Cir.1977); *First National Bank of Montgomery,* 467 F.2d 167 (5th Cir.1972).[19]

Some states have spared the courts the task of interpreting general credit statutes by enacting legislation which specifically regulates bank credit card programs.[20] For whatever reason, California has not directly regulated interest rates of bank credit card programs. The Bank's program, therefore, either falls within the interest rate proscriptions of the Unruh Act as a retail installment plan or remains unregulated as a bank loan.

■ After careful review of state law, the two statutes which pertain to credit card transactions, the Unruh Act and the Song-Beverly Credit Card Act ("Credit Card Act"), Cal.Civ.Code § 1747.01 *et seq.,* and some of the relevant legislative history, the Court finds that the legislature did not intend to regulate the interest rate charged by banks in the credit card program under the Unruh Act.

■ According to time-honored canons of judicial construction, if the language of a statute is clear and unambiguous, resort to legislative history is inappropriate. *Kenai Peninsula Borough v. Alaska,* 612 F.2d 1210, 1213 (9th Cir.1980). The wording of the statute, however, leaves uncertain whether or not the Bank's credit card program is covered by the Unruh Act. Mindful of the

---

**18.** The customer's use of the credit card is also analogous to another traditional banking function, checking accounts. The merchant accepts a check issued by a bank for the entire amount of the purchase and then deposits it with the bank. The bank credits this amount to the merchant's account and then forwards it to a clearing house. The clearing house in turn sends it to the issuing bank which reimburses the merchant bank and debits the customer's account. If the issuing bank permits overdrafts on the customer's account, the analogy is even more appropriate. Otherwise, the merchant takes the risk of nonpayment of the check, a risk the merchant does not bear in the credit card program.

**19.** The Bank's attempt to reconcile these cases by positing that each court choose whatever characterization, either credit sale or loan, permitted a bank to charge the higher interest rate as a matter of policy is unworkable. The Court's primary function in this case is to interpret the language of the statutes and, if necessary, discern legislative intent.

**20.** The Uniform Consumer Credit Code drafted by the National Conference of Commissioners on Uniform State Laws, distinguishes *seller* credit card programs from *lender* credit card programs, treating the latter as a form of a consumer loan. *See* § 1.301(25). A "supervised financial organization," such as a state or nationally chartered bank, may charge higher interest rates on consumer loans than sellers may charge on their credit card accounts. § 2.401(2). A number of states have adopted these UCCC provisions. *See, e.g.,* Idaho Code 28–32–104(2)(a) and 28–32–201 (1980 and Cum.Supp.1981); Ind.Code Ann. 24–4.5–2–104(2)(a) and 24–4.5–2–201 (Cum.Supp.1981); Okla.Stat. 14A §§ 3–106, 3–108 and 3–508A (1971); Utah Code Ann. 70B–3–309, 3–310 and 3–501 (1980); Wyo.Stat.Ann. § 40–14–212 (1977).

Minnesota sets an interest rate ceiling for open-end loan accounts pursuant to a credit card plan. Minn.Stat. § 48.185 (1980). In Nebraska, interest rates for bank credit card accounts are governed by the general statutes regulating personal loans made by banks. Neb.Rev.Stat. § 8–101(8) (Supp.1976).

California Supreme Court's admonition not to elevate the form of the transaction over its substance, *Glaire v. La Lanne-Paris Health Spa, Inc.,* 12 Cal.3d 915, 528 P.2d 357 (1974), the Court concludes that the most reasonable interpretation of the Unruh Act does not include bank credit card programs.

The Unruh Act defines a retail establishment sale as "the sale of goods or the furnishing of services by a retail seller to a retail buyer for a deferred payment price payable in installments." Cal.Civ.Code § 1802.5. A retail seller is "a person engaged in the business of selling goods or furnishing services to retail buyers." Cal. Civ.Code § 1802.3. The Bank is not a retail seller because it has no interest in any particular product. Nor can the agreement be characterized as a retail installment contract. The terms of the credit account are predetermined by the Bank and the customer without the participation of the merchant, who also has no knowledge of the buyer's credit rating. Unlike an installment contract by the seller, the credit card program contemplates that the seller will be fully reimbursed, minus a fee due to the bank, by the issuing bank upon depositing the slip.

Plaintiff argues that the close relationship between the retail seller and the Bank, plus the fact that the Bank furnishes services to the retail buyer within the meaning of § 1802.3, justifies characterizing the Bank as a retail seller under the Unruh Act. In contrast to typical loan transactions, the Bank solicits merchants to participate in the credit card program who must agree to fulfill certain administrative obligations, such as securing authorization for purchases over a certain dollar amount and correctly filling out the credit card slip. The Bank supplies the credit card slips. Also, the retail seller must pay a fee to its bank (which may or may not be the issuing bank) based upon the seller's monthly sales.

The close relationship between the Bank and retail seller is not sufficient to convert a loan to a retail buyer into a retail installment sale unless the Bank and the seller are related by common ownership and control, and the relationship was a material factor in the loan transaction, or they share in the profits or losses of either the loan or the sale. Cal.Civ.Code § 1801.6.[21] Although the retail buyer asserts claims or defenses against the Bank with respect to goods purchased with his or her credit card, a loss for which the merchant must reimburse the Bank, the legislature has stated that this factor does not constitute a sharing of loan losses by the seller. Cal.Civ.Code § 1801.-6(c)(3). Neither does the obligation of the seller to pay a fee to its bank based upon the seller's monthly sales constitute a sharing of profits in the sale. Banks generally charge handling fees which fluctuate depending on the dollar amount involved, and the fee is based upon the gross amount of the sale irrespective of the net profit or loss. The transaction is structured to apportion the burden of the credit risk upon the bank and the risk of profitability of sales upon the seller.

*Fox v. Federated Department Stores, Inc.,* 94 Cal.App.3d 867, 156 Cal.Rptr. 893 (1979), is not controlling on this issue. In that case, the court held that oil companies which issue credit cards that may be used to purchase products at service stations owned by independent dealers were subject to the Unruh Act, and not the usury laws of the California Constitution, *supra.* The court adopted the reasoning of those cases such as *Kass, supra,* and *Uni-Serv, supra,* which held that bank credit card programs were credit sales not loans. However, the holding is bottomed on the fact that the oil companies involved were selling their *own* products, such as gas and other automobile products, through the independent dealers. *Fox, supra,* 94 Cal.App.3d at 873, 884, 156 Cal.Rptr. at 898. While the interposition of

---

**21.** This amendment to the Unruh Act was enacted in response to a California Supreme Court ruling that a bank's furnishing of financing services falls within the definition of "services" under the Act and, therefore, the bank could be a retail seller within the meaning of the Act when a close relationship exists between the bank and the seller. *King v. Central Bank,* 18 Cal.3d 840, 135 Cal.Rptr. 771, 558 P.2d 857 (1977).

an independent dealer between the retail seller and the retail buyer may be insufficient to transmute a credit sale into a loan, the close supervision by the Bank of the retail sale is insufficient to convert a loan into a credit sale as emphasized by § 1801.-6.[22]

■ If § 1801.6 does indeed exempt bank credit card programs from the Unruh Act,[23] this amendment does not violate Article IV, §§ 16(a) and 16(b) of the California Constitution which requires uniform operation of general statutes. As noted *supra,* many states have adopted the UCCC which permits supervised lending institutions to charge a higher finance rate on credit card accounts than permitted retail sellers on their own installment sales. Cogent reasons for allowing this distinction, such as consumer convenience, increased efficiency in processing loans and credit programs for small retailers unable to extend their own credit, are more fully explained in Brandel & Leonard, *Bank Charge Cards: New Cash or New Credit,* 69 Mich.L.Rev. 1033 (1971).

Plaintiff's final argument is that the Bank is a holder who purchases the retail installment sales contract, against whom a buyer may assert the same defenses as against the retail seller under § 1804.1(a). The payment by the merchant of a percentage of the sales slip, based on monthly credit card sales figures, is similar to a financing agency purchasing an installment contract at a discount. Also, the contract between the merchant and the Bank calls for the merchant to "repurchase" the sales slip from the Bank if a retail buyer asserts a defense against the Bank with respect to the goods purchased.

Yet other sections of the Act indicate that the Bank does not come within the definition of a "holder" under the Act. A financing agency which purchases an installment contract does not set the original terms nor make the initial investigation of the buyer's credit rating. The financing agency is merely the assignee of the retailer who entered into the agreement. The Unruh Act permits a holder to refinance the unpaid balance if agreed to by the buyer under certain restrictions. *See* Cal.Civ. Code § 1807.2. Under the Bank's credit card plan, however, the Bank and the buyer agree upon the terms of credit before the buyer purchases from the merchant. At the time of the purchase, the buyer has not even elected to take advantage of the Bank's credit by making installment payments instead of paying the entire bill when issued by the Bank. The justification of holding a financing agency who purchases the installment contract to the terms agreed upon by the retailer and the buyer are absent here.

The uncertainties of the language of the Unruh Act is clarified when the Act is compared to the Credit Card Act enacted in 1971 which imposes certain requirements on issuers of credit cards, defined as "any card, plate, coupon book or other credit device existing for the purpose of being used from time to time upon presentation to obtain money, property, labor, or services on credit." Cal.Civ.Code § 1747.02(a).[24] Two sections in particular, §§ 1747.90 and 1748.5, evince an understanding by the legislature that bank credit card programs are not

**22.** Nor does *Fox* attempt to distinguish *Master Charge v. Daugherty,* 123 Cal.App.2d 700, 267 P.2d 821 (1954), which held that the Master Charge Corporation, which apparently was not then affiliated with banks as it is today, must obtain a small loan law license because it loaned credit. Plaintiff cites this case for the proposition that these credit card programs are not loans of money; rather they are loans of credit. She misses the point that the court drew a distinction between oil company credit card programs, which merely extended credit like any other retailer, and the Master Charge transaction which consisted of a loan of credit.

The difference between a loan of money and a loan of credit is insufficient analytically to persuade the Court that this case favors plaintiff.

**23.** However, the Court relies more upon the significance of the Song-Beverly Credit Card Act of 1971, Cal.Civ.Code § 1747.01 *et seq.,* for its holding that the Bank's credit card program is not covered by the Unruh Act.

**24.** For example, the credit card issuer must respond to inquiries from cardholders within a certain amount of time and cannot issue credit cards unsolicited.

covered by the Unruh Act. Section 1747.90 permits a cardholder to assert against the card issuer any defenses he or she could assert against the retailer, but only when the amount of purchase exceeds $50; the purchase was made within California; and the buyer has already made a written demand to the retailer without satisfaction.[25] This section does not apply to credit card issuers who operate retail outlets. Cal.Civ. Code § 1747.90(g). Were banks considered retailers or holders under the Unruh Act, § 1747.90 of the Credit Card Act would be unnecessary as recognized by subsection (g).

Section 1748.5, which was added to the Credit Card Act in 1976, requires card issuers to furnish an annual statement to the cardholder of the amount of interest or finance charges paid by the cardholder the preceding year. The Unruh Act was also amended in 1976, before the Credit Card Act's amendment, to require an annual statement of finance charges paid by the retail buyer *if* the retailer has $150,000,000 in sales annually. Cal.Civ.Code § 1810.11. This amendment is implicitly noted in the Credit Card Act, which exempts credit card issuers who issue cards pursuant to a retail installment contract as defined by the Unruh Act from the annual statement requirement under the Credit Card Act. Cal.Civ. Code § 1748.5(b). If bank credit card programs were subject to the Unruh Act, § 1746.5 of the Credit Card Act would be superfluous with the exception of those few credit card plans which do not permit installment payments, such as American Express.

Since the language of both statutes, the Unruh Act and the Credit Card Act, are neither clear nor unambiguous on the issue raised here, it is appropriate for the Court to turn to legislative history. The Court's interpretation of the two statutes, that the legislature did not intend to include bank credit card programs within the confines of the Unruh Act, is confirmed by a memorandum prepared by the Assembly Office of Research for the third reading of the bill which amended the Credit Card Act in 1976.[26] Summarizing the bill, the author states:

> "Chapter 82, *Statutes of 1976,* amended the Unruh Retail Installment Sales Act requiring retailers with $150 million or more in annual sales to provide their credit customers with an annual statement of the finance charges that the customers were charged or actually paid during the preceding year by 1 March. Chapter 82 becomes effective 1 March 1979 giving retailers more than two years to comply with the act.
>
> This bill would amend the Song-Beverly Credit Card Act making a similar requirement of credit card issuers other than retailers. This bill requires credit card issuers to furnish an annual statement to their customers of the amount of interest or finance charge they actually paid in the preceding year by each 15 February. This bill would be effective 1 January 1978, which allows the credit card issuers a little more than one year to comply with the bill's provisions. Credit card issuers who are retailers as defined in the Unruh Act are specifically exempt."

Under the heading "Comments" the author explains:

> "If this bill is enacted, there will be three classes of credit card issuers with this general requirement for an annual statement of finance charges: 1) retailers subject to the Unruh Act with less than $150 million in annual sales, who will not be

---

**25.** This section parallels the proposal of Brendel and Leonard for providing the consumer with recourse against the bank which issues the credit card. They suggest these geographic and purchase amount limitations to accommodate the peculiarities of bank credit card programs. The monetary limit avoids severely increasing transaction costs and burdening the system with disputes arising from the enormous amounts of small purchases. The geographic limitation avoids the problem of the issuing bank trying to resolve disputes between a merchant and customer who may live thousands of miles apart. 69 Mich.L.Rev. at 1059–68.

**26.** Defendant's Appendix I to its memorandum of points and authorities in support of motion to dismiss plaintiff's petition for writ of mandamus and complaint for injunction.

required to provide annual statements by either Chapter 82 or this bill; 2) retailers subject to the Unruh Act with more than $150 million in annual sales who will have to comply with Chapter 82; 3) all other credit card issuers, such as BankAmericard, Mastercharge, Diners Club, Carte Blanche, and American Express who will have to comply with this bill."

Although plaintiff argues that the Bank cannot complain if it chose to structure its transactions in such a way as to be a retail installment contract as defined by the Unruh Act, there is no reason to think that the Bank's Master Charge and VISA programs operated in a different manner in 1976. The legislature, being fully familiar with the credit card industry, chose not to regulate the interest rate of the nonretail credit card issuers. Thus, plaintiff's claims of Unruh Act violations cannot stand.

## IV

Finally, plaintiff contends that as a public service corporation, the Bank violated its common law duty not to arbitrarily discriminate between customers by charging customers who open credit card accounts after July 15, 1980, a 20 percent annual finance charge and charging all other customers an additional 2 percent finance charge on their outstanding balance. A bank is not a public service corporation. But even if it were, the obvious answer to plaintiff's contention is that the Bank has not arbitrarily discriminated against its pre-July 15, 1980, customers. In fact, all customers are being charged the same annual finance charge, namely, 20 percent. To the extent that old customers have to pay a larger dollar amount in finance charges than do post-July 15, 1980, customers, the distinguishing factor is the amount of outstanding balance. The old customers will naturally have a larger outstanding balance since they have used their credit cards for a longer period of time. Viewed in this light, the distinction is not discriminatory. *See Alabama State Docks Department v. Bunge Corp.*, 655 F.2d 64, 66–67 (5th Cir.1981) (tariff which set progressive storage rates for grain stored in state facilities depending on the length grain had been stored as of the effective date of the act is neither unreasonable nor discriminatory by making a distinction between one who has already stored his goods for a length of time and one who has stored goods for a lesser time or for no time at all).

For the reasons stated above, the Court grants defendant's motion for summary judgment and denies plaintiff's cross-motion for summary judgment. Defendant will prepare and lodge with the Court by October 26, 1981, a judgment approved as to form by plaintiff.

APPENDIX A

## Wells Fargo Bank
NATIONAL ASSOCIATION/MEMBER FDIC

May 1980

We appreciate having you as a Visa customer. We are making some necessary changes to your account . . . but, we are not charging an annual fee.

Dear Customer:

You'll be pleased to know that Wells Fargo is not instituting an annual fee for your Visa card. Due to the increased costs of providing credit card services, together with federal credit restraints, many banks have increased their credit card interest rates and fees. We, too, find certain changes are necessary.

We want you to pay for your Visa account only when you use it. As in the past, we expect you'll turn to your Wells Fargo Visa card to take advantage of special purchase opportunities, and for those occasions when you find your Visa card more convenient to use than cash or a check. However, when and how you use your card are still matters for you to decide.

Please refer to the enclosed notice for a detailed description of the following changes which become effective if you use your card after July 15, 1980:

The Monthly Periodic Finance Charge rate is being increased to 1.67% (20% Annual Percentage Rate). The current rate is 1.5% (18% Annual Percentage Rate). The new rate reflects our increased cost of lending money to our Visa customers. A new Purchase Activity Charge of $1.00 will be applied to your account in each billing period when one or more purchases are posted to your account. This means you'll pay for the convenience of purchasing goods or services on your Visa account only when you use it. This new charge reflects the increased costs of maintaining and operating our credit card service.

The Minimum Monthly Payment is being increased to $20, or 4% of your outstanding balance, whichever is greater. Currently, the minimum is $15 or 3%.

The Cash Advance Transaction Charge will be 2% of the amount of the advance, with a minimum charge of $5. The present charge is $3 per advance.

An Over-Limit Charge of $5 will be assessed on your account if you exceed your credit limit.

Please give special attention to the options for using your Visa account described in the attached notice. If you use your card on or after July 15, 1980 the new terms automatically apply to your account. You also have the choice of paying off your balance under the existing terms and conditions. Of course, which option you choose and how you use your card are entirely up to you.

We appreciate having you as a customer of Wells Fargo Bank. It remains our goal to keep the use of your Visa account as convenient as possible, and we hope you will continue to look upon it as a valuable financial service.

Sincerely,
/s/ G.L. Husby
G.L. Husby
Senior Vice President
Credit Card Division

GLH/khfg

P.S. If you have questions, please call our toll free customer service numbers:

From San Francisco  396–5725
Within California  (800) 652–1722
Outside California  (800) 227–4464

## NOTICE OF CHANGE IN TERMS IN WELLS FARGO VISA ACCOUNTS EFFECTIVE JULY 15, 1980

**WARNING:** Continued use of your account on or after July 15, 1980, will result in stricter terms. You have TWO OPTIONS:

1. You may stop making charges on your account before July 15, 1980, and pay off under the existing terms described in this notice all or any part of what you owe us on that date. You may continue to use your account on or after that date, but if you do so, the new terms will apply as explained in option (2) below.

   OR

2. You may make charges on your account on or after July 15, 1980, in which case the new terms described in this notice will apply to what you then owe us and to future charges.

We are making five changes in the terms that apply to your Visa account.

We are increasing the Monthly Periodic FINANCE CHARGE Rate to 1.67% (20% ANNUAL PERCENTAGE RATE) and increasing the Cash Advance Transaction FINANCE CHARGE rate to at least $5 or 2% of the amount of the Cash Advance.

We are imposing two new charges:

An Overlimit Charge of $5 for each time in a billing period that your account goes overlimit.

A Purchase Activity Charge of $1 for each billing period in which new purchases are charged to your account.

In addition, we are increasing your Minimum Monthly Payment by raising to 4% the amount of the new balance you are required to repay.

Shown below is a comparison between the new terms to be effective on July 15, 1980, and the corresponding existing terms:

|  | New Terms | Existing Terms |
|---|---|---|
| Monthly Periodic FINANCE CHARGE Rate | 1.67% (20% ANNUAL PERCENTAGE RATE) | 1.5% (18% ANNUAL PERCENTAGE RATE) |
| Purchase Activity Charge | $1 charged once in each billing period where one or more new purchases are posted to your account | None |
| Cash Advance Transaction FINANCE CHARGE | 2% of the amount of the advance (minimum of $5) | $3 per advance |
| Overlimit Charge | $5 charged each time during the billing period that your account balance goes over your credit limit | None |

| | New Balance | Amt. In Minimum Payment | New Balance | Amt. In Minimum Payment |
|---|---|---|---|---|
| Amount of New Balance included in Minimum Payment | Less than $20 | Full Amount | Less than $15 | Full Amount |
| | $20 to $500 | $20 | $15 to $500 | $15 |
| | $500 or more | 4% of new balance | $500 or more | $3% of new balance |

Although the new terms will become effective on July 15, 1980, the new FINANCE CHARGE rate and the new Minimum Monthly Payment percentage will not necessarily be applied to the amounts you owe us on that date. This is true because *you have a choice about how you manage your account:* you can either pay down your existing balance at the current rates, or you can use your account after the effective date and pay off both your existing balance and new balances at the new rates.

1. *If you do not use* your Visa account to make a purchase or a Cash or Loan Advance, you may continue to pay down the amounts you owe us on your account at the current rates. Those rates will continue to apply *until* you charge a purchase to your account or you make a Cash or Loan Advance from your account.

2. If you use your Visa account to make a purchase or Cash or Loan Advance on or after July 15, 1980, the new terms will then apply both to any amounts you still owe us and to any new amounts you borrow. *If you have* authorized us to bill your account directly for an insurance premium or other continuing charge, we will consider the first posting on or after July 15 of such a charge as a purchase on your account and acceptance of new terms and conditions. These new terms will become effective in the first billing period in which a purchase or Cash or Loan Advance made by you on or after July 15, 1980, is posted to your account:

    The increased Monthly Periodic Rate will be applied to the Average Daily Balance in your account to calculate the FINANCE CHARGE on the closing date of that billing period;

    The new Purchase Activity Charge will be applied if new purchases were posted to your account in that period;

    The increased Transaction FINANCE CHARGE rate will be applied to any Cash Advances posted during that period;

The new Overlimit Charge will be applied for each time your balance went over your credit limit during that period;

The Minimum Payment due at the close of that period will be based on the increased percentage of the new balance.

From then on, the new terms will apply to your account until the account is closed or the terms are changed again.

.

Wells Fargo Bank, N.A. Credit Card Division